In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-2509

JENNIFER R. WILSON-TRATTNER,

*Plaintiff-Appellant*,

*v.*

ROBERT CAMPBELL, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:14-cv-1083-LJM-DML — **Larry J. McKinney**, *Judge*.

ARGUED MARCH 27, 2017 — DECIDED JULY 11, 2017

Before BAUER and EASTERBROOK, *Circuit Judges*, and
DEGUILIO, *District Judge*.*

DEGUILIO, *District Judge*. In this appeal, the Plaintiff argues
that the district court incorrectly granted summary judgment

---

* Hon. Jon E. DeGuilio of the Northern District of Indiana, sitting by designation.

for the defense on three of her claims: a substantive due process claim under 42 U.S.C. § 1983, a failure to train claim under 42 U.S.C. § 1983 and an intentional infliction of emotional distress claim under Indiana law. Each of these is based on allegations that officers of the Hancock County, Indiana Sherriff's Department improperly responded to the Plaintiff's complaints of domestic abuse. For the reasons that follow, we affirm the judgment of the district court.

## I.

Plaintiff Jennifer Wilson-Trattner began dating Scott Roeger (then a deputy with the Hancock County Sherriff's Department) in 2010. By 2012, the couple's relationship had become combative. The allegations in this case center on four incidents that followed.[1]

First, on June 17, 2012, Roeger locked Wilson-Trattner out of her house by stealing her house key and reprogramming her garage door opener. When she called the police, officers from both Hancock County and another agency, the McCordsville, Indiana Police Department, responded. Lieutenant Jeff Rasche of Hancock County asked Roeger to return the key to Wilson-Trattner, but Roeger refused. Wilson-Trattner also showed Rasche a text message she had received from Roeger that said "you have fucked with the wrong person," though Rasche did not find that message inappropriate. Rasche later told Wilson-Trattner "we can't help you; this is

---

[1] Wilson-Trattner also cites a fifth incident on September 15, 2013, in which Roeger contacted the Greenfield, Indiana Police Department and falsely claimed that Wilson-Trattner had assaulted him. That would not appear probative of Roeger's propensity to harm Wilson-Trattner, but even if it were, there is no evidence that the appellees were aware of it.

between you and him." He also instructed Roeger that, though Roeger's personal life is not typically a department issue, it becomes a department issue when Wilson-Trattner contacts the police. Rasche drafted an internal memorandum regarding this incident, though no disciplinary action was taken against Roeger.

On June 29, 2012, Roeger became angry after learning that Wilson-Trattner had made plans on his night off. He yelled at her, threw her against a wall and choked her to the point she couldn't speak. Wilson-Trattner wanted to avoid an official police response, so she called an officer she believed to be off-duty to get Roeger out of her house. That officer then called his supervisor and four or five officers ultimately arrived at Wilson-Trattner's home from both the Hancock County and McCordsville departments. They first spoke with Roeger downstairs, who told them that Wilson-Trattner had hit him and that he pushed her away to defend himself. They then met with Wilson-Trattner, who was upstairs in her bedroom, and told her that she could go to jail based on what Roeger had said. Wilson-Trattner felt intimidated and was too scared to fully provide her side of the story. Rather, she denied Roeger's account, stated that she did not hit Roeger until he slammed her head into the wall and declined to talk further. A McCordsville officer encouraged her to speak when she was ready to do so and left her with a domestic violence handout and a business card.

Following this incident, Hancock County Deputy Jarrod Bradbury drafted a memorandum to Captain Bobby Campbell, which stated that Roeger had been ordered to not return to Wilson-Trattner's house or contact her. Hancock County Sheriff Mike Shepherd also assigned Detective Ted Munden

to draft a report. Munden spoke with Wilson-Trattner, but she was unwilling to discuss the incident and said that she did not want Roeger to get in trouble. Munden also interviewed Roeger, who said that he had acted in self-defense. Munden concluded that Roeger had violated departmental regulations, though did not specifically recommend any personnel action. While Munden delivered his report to Shepherd on or before July 23, 2012, Shepherd does not remember receiving it. He later found it in a filing cabinet, though does not recall putting it there.

On July 8, 2013, Roeger became angry after seeing Wilson-Trattner get a phone call from another man. He sent that man and Wilson-Trattner numerous lewd and threatening text messages, including sexually explicit photos and videos of Wilson-Trattner. He also told Wilson-Trattner that she had "fucked with the wrong person" and wished that she would die. This prompted Wilson-Trattner to file a formal complaint with Campbell. Campbell said he did not see anything threatening about Roeger's text messages. He told Wilson-Trattner that he was "sick of dealing with this shit" and that she "shouldn't call [Hancock County] for this personal shit." He then advised her to obtain a protective order. There is no evidence that she ever did so. Campbell also told Roeger that his conduct was inappropriate and instructed him not to contact Wilson-Trattner. Campbell initiated an internal investigation, though says he misplaced the investigation paperwork in the trunk of his car. He never delivered the findings of his investigation to Shepherd.

Things culminated on October 6, 2013, when Roeger broke into Wilson-Trattner's house while he was extremely intoxicated. When Wilson-Trattner confronted him, he pushed her

out of the way. He then saw a male friend of Wilson-Trattner's and became enraged. He screamed and punched a hole in a door and knocked three pictures off of the wall. He left the house briefly, only to return and threaten Wilson-Trattner and her friend. Wilson-Trattner's friend then called 911 and Roeger left before the police arrived. Hancock County Deputy Gary Achor responded and told Wilson-Trattner "we're sick of getting these calls from you" and "if you keep crying wolf, we're just going to stop responding." The McCordsville Department subsequently arrested Roeger. He pled guilty to criminal charges and resigned from the Hancock County Sheriff's Department following the initiation of termination proceedings against him.

Wilson-Trattner filed this lawsuit on June 27, 2014 against Roeger, Shepherd, Campbell and Munden, as well as Hancock County Officer Brad Burkhart.[2] On summary judgment, as is relevant here, the district court granted judgment for the defense on Wilson-Trattner's § 1983 substantive due process claim (against Shepherd, Campbell, Munden, Burkhart and Roeger in their individual and official capacities), § 1983 failure to train claim (against Shepherd in his official capacity) and intentional infliction of emotional distress claim (against Shepherd in his official capacity). It declined to grant judgment on the battery and intentional infliction of emotional distress claims against Roeger. The district court then entered partial final judgment in favor of all of the above defendants

---

[2] Wilson-Trattner also initially sued Hancock County and the Hancock County Sheriff's Department, but later agreed to voluntarily dismiss them.

other than Roeger under Federal Rule of Civil Procedure 54(b). This appeal followed.

**II.**

We review the district court's grant of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in the Plaintiff's favor. *See, e.g.*, *Collins v. Al-Shami*, 851 F.3d 727, 730–31 (7th Cir. 2017).

The parties first contest whether Wilson-Trattner sufficiently substantiated her substantive due process claim. The due process clause generally confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). As such, a state's failure to protect an individual against private violence does not constitute a violation of the due process clause. *Id.* at 197. Under the state-created danger doctrine, however, a substantive due process claim can proceed where the state "affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015). To prevail under such a theory, the Plaintiff must show that (1) the state by its affirmative acts created or increased a danger to her, (2) the state's failure to protect her from danger was the proximate cause of her injury and (3) the state's failure to protect her shocks the conscience. *D.S. v. E. Porter Cty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015). This is a narrow doctrine that applies only in "rare and often egregious" circumstances. *Doe*, 782 F.3d at 917 (quoting *Estate of Allen v. City of Rockford*, 349 F.3d 1015, 1022 (7th Cir. 2003)).

At oral argument, Wilson-Trattner conceded that Roeger was not serving as a state actor in his interactions with her. Rather, she argues that her claim implicates a state-created danger because the appellees "conveyed the unmistakable message" to Roeger that they would not interfere with his on-going abuse, thereby emboldening him to reoffend. Thus, she says, they placed her at a greater risk of domestic violence than she would have faced had they done nothing at all.

She points largely to a single incident to support her claim.[3] This is the law enforcement response to the June 29, 2012 confrontation in which Roeger choked Wilson-Trattner and slammed her head against a wall. Recall that four or five officials responded to Wilson-Trattner's home from the Hancock County Sheriff's Department and McCordsville Police Department. After taking Roeger's statement, the officers approached Wilson-Trattner, who was in her bed in her upstairs bedroom. All of the officers were male and they stood above Wilson-Trattner in a manner that she considered "very intimidating." They explained that she could go to jail, since Roeger had said that she hit him. Wilson-Trattner argues that this amounted to the officers "cajoling" her in the face of domestic abuse.

---

[3] In briefing and at oral argument Wilson-Trattner's counsel also argued that the appellees "cleansed" Roeger's personnel file of references to his misconduct. However, counsel subsequently conceded that Roeger had no knowledge of any such actions, and that they thus could not have emboldened him to abuse Wilson-Trattner. Similarly, while Wilson-Trattner ascribes some relevance to the dismissive and derisive comments Hancock County officers made to her, there is no evidence that Roeger was aware of them.

There is no indication, however, that any of these officers did anything to embolden Roeger or otherwise indicate that he could abuse Wilson-Trattner with immunity. As an initial matter, it is unclear whether any of the appellees even participated in this encounter (and if they did, what the extent of their involvement was). Wilson-Trattner testified that she had "no idea" who the officers were, other than one officer she recognized who was not with the Hancock County Sherriff's Department. Further, it does not appear that the officers "cajoled" her, but rather warned her that she could go to jail in light of Roeger's allegations against her, and accordingly encouraged her to provide her side of the story. More importantly, regardless of what transpired upstairs, it would not have emboldened or otherwise affected Roeger, who was downstairs when the officers confronted Wilson-Trattner. Finally, there is no evidence that any officer directly encouraged Roeger or otherwise told him that he could abuse Wilson-Trattner with immunity. On the contrary, Hancock County responded to Wilson-Trattner's call, notified the McCordsville Department regarding the same and interviewed both Roeger and Wilson-Trattner. While this may have fallen short of an optimal response, it at least would have conveyed to Roeger that Hancock County did not consider the incident trivial.

Wilson-Trattner also makes a more general argument that the appellees' dismissive and indifferent attitudes to each of the incidents above endangered her by progressively emboldening Roeger. That contention is, however, squarely foreclosed by *DeShaney*. 489 U.S. at 197; *see also Doe*, 782 F.3d at 918 (rejecting a claim under the state-created danger doctrine where a police officer did nothing to prevent a group of three males from leaving with an extremely intoxicated female and

a sexual assault ensued). Though Wilson-Trattner character-izes the Department's ineffectual response as affirmatively in-creasing the danger to her, such semantics cannot skirt prece-dent. *See Doe*, 782 F.3d at 917 ("To create or increase must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect and thus circum-vent *DeShaney's* general rule.") (internal quotation marks and citation omitted). Further, even if the appellees' failure to in-tervene ultimately increased the danger to Wilson-Trattner by indirectly emboldening Roeger to continue to mistreat her, that would not distinguish her case from *DeShaney*. There state officials did not remove a child from an abuser's care de-spite numerous obvious indications of abuse over a period of about two years. 489 U.S. at 192–93. The abuse accordingly continued unabated, ultimately resulting in severe brain dam-age to the child. *Id*. The Supreme Court nevertheless con-cluded that the inaction of state officials was insufficient to support a claim under the state-created danger doctrine. *Id*. at 201. That holding is equally applicable here.

The Supreme Court subsequently reaffirmed this princi-ple in *Town of Castle Rock v. Gonzales*, in which it held that there is no due process right to have another arrested for one's own protection. 545 U.S. 748 (2005). In that case, a woman's hus-band took her children in violation of a protective order. The woman repeatedly implored the police to enforce the protec-tive order, but they refused to do so, and the husband then murdered the children. The Court found that this did not give rise to a procedural due process claim, as the plaintiff had no property right in the enforcement of the restraining order. It further noted that "[i]n light of today's decision and that in *DeShaney*, the benefit that a third party may receive from hav-

ing someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its 'substantive' manifestations." *Id.* at 768. Wilson-Trattner correspondingly lacks a viable due process claim.

We also reject her reliance on *Okin v. Village of Cornwall-On-Hudson Police Department*. 577 F.3d 415 (2d Cir. 2009). In that case, the Second Circuit allowed a substantive due process claim to survive summary judgment where police officers expressed camaraderie with a perpetrator of domestic violence and repeatedly failed to punish him. The court of appeals reasoned that, in doing so, the officers implicitly communicated to the perpetrator that his violence would go unpunished, thereby increasing the risk of harm to the victim. *Id.* at 429–30.

Though this holding appears to be in tension with *DeShaney* and *Castle Rock* (indeed it is more like the dissent in *Castle Rock*, which it cites in noting the "serious and unique risks and concerns of a domestic violence situation," *Okin*, 577 F.3d at 431 n.10) we need not decisively decline to follow it since *Okin* involved facts significantly different from those at issue here. In *Okin*, the police expressed solidarity with the victim's assailant by discussing football with him. *Id.* at 430. The police also took no action in the face of obvious and repeated violence. Among other things, officers observed bruises on the plaintiff, the plaintiff had lodged numerous complaints of violence (including that she had been stabbed, kicked, choked, punched and had a bottle thrown at her head) and the perpetrator himself told the police that he "could not help it sometimes when he smack[ed] [the victim] around." *Id.* at 420–24.

In contrast, here only one violent encounter occurred prior to the October 2013 incident in which Roeger was arrested and charged. Further, when police responded to it, Roeger indicated that Wilson-Trattner had instigated the confrontation. While Wilson-Trattner denied that (and said that Roeger had slammed her head into the wall), she also said that she did not want Roeger to get in trouble, did not show police her injuries and did not provide police with her account of events.

Further, there is no evidence that responding officers expressed camaraderie with Roeger, for example by discussing football with him as the officers did in *Okin*. In fact, while the Hancock County Department's response to Wilson-Trattner's complaints may have been tepid, the department did at least repeatedly inform Roeger that his conduct was unacceptable. Among other things, following the June 17, 2012 incident, Rasche told Roeger that his personal life becomes a department issue when he acts as he did and Wilson-Trattner calls law enforcement. After the June 29, 2012 incident, Munden completed an "insubordination warning form" following his interview with Roeger. And after the July 8, 2013 incident, Campbell told Roeger that his conduct was inappropriate and instructed him not to contact Wilson-Trattner. This case is accordingly distinguishable from *Okin*.

In sum, we find no evidence that any of the appellees created or increased a danger to Wilson-Trattner. Mere indifference or inaction in the face of private violence cannot support a substantive due process claim under *DeShaney* and *Castle Rock*. Further, Wilson-Trattner's theory that Hancock County officers increased a danger to her by implicitly condoning violence against her is both questionable in light of *DeShaney* and *Castle Rock* and unsupported by the facts. As such, the

district court correctly granted summary judgment on the Plaintiff's substantive due process claim.[4]

## III.

We also agree with the district court's resolution of the Plaintiff's failure to train and intentional infliction of emotional distress claims. The former cannot proceed without evidence of an underlying constitutional violation, *D.S.*, 799 F.3d at 800, which, for reasons set forth above, we find lacking. Moreover, Wilson-Trattner provides no evidence to support this claim other than a one-page "pre-basic training" schedule. While she says that the defense admitted in response to a discovery request that this is the only training officers receive, she does not cite or attach that discovery request.

As to the intentional infliction of emotional distress claim, Wilson-Trattner must establish (1) extreme and outrageous conduct, (2) which intentionally or recklessly (3) caused her (4) severe emotional distress. *Curry v. Whitaker*, 943 N.E.2d 354, 361 (Ind. Ct. App. 2011). As the district court properly concluded, she has not presented any evidence of extreme or outrageous conduct.[5]

---

[4] Even if we were to find otherwise, the appellees would be entitled to qualified immunity in their individual capacities, since the unconstitutionality of the appellees' actions is far from clearly established under *DeShaney*. *See Doe*, 782 F.3d at 915.

[5] Wilson-Trattner also contends that the appellees did not carry their initial burden before the district court of articulating why summary judgment was warranted on the intentional infliction of emotional distress claim. But, while contrite, the Defendants' brief did argue that the Plaintiff lacked evidence of extreme and outrageous conduct. *See Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (noting that a moving party may

She points to four occurrences to substantiate this element of her claim: (1) officers failing to take action against Roeger despite him threatening her and smashing her head into a wall, (2) officers standing over her and threatening her with arrest, (3) officers dismissing her requests for assistance by telling her "we can't help you," "we're sick of dealing with this shit" and that she "shouldn't call in for this personal shit" and (4) the "misfiling" of investigative reports against Roeger.

None of this conduct is sufficiently outrageous to give rise to a cognizable claim. Her first two allegations, if anything, describe an insufficient response to her calls for assistance. That is not outrageous, particularly in light of Wilson-Trattner's statements to police that she did not want Roeger to get in trouble. And while officers may have indicated that she could be arrested after the June 29, 2012 incident, that was after Roeger told them that Wilson-Trattner initiated the confrontation and Wilson-Trattner did not provide her full side of the story. Wilson-Trattner's fourth allegation seems to implicate negligent conduct. But, even granting the inference that the Department intentionally buried the reports at issue, there is no indication that it did so with reckless disregard for the fact that it would cause Wilson-Trattner severe emotional distress.

Wilson-Trattner's third allegation is simply not egregious enough to constitute outrageous or extreme conduct. *See, e.g.*, *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 747 (7th Cir. 2003) (police officer calling a woman a bitch not extreme or outrageous conduct). While some courts have found mocking

---

discharge its burden by "pointing out to the district court … that there is an absence of evidence to support the nonmoving party's case").

a sexual assault victim to give rise to an intentional infliction of emotional distress claim, *see, e.g.*, *Snyder v. Smith*, 7 F. Supp. 3d 842, 862 (S.D. Ind. 2014), the dismissive conduct at issue here does not rise to the flagrant callousness exhibited in those cases. As such, the district court properly granted summary judgment for Shepherd on the Plaintiff's intentional infliction of emotional distress claim. The judgment of the district court is therefore AFFIRMED.