# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Stanley Crawford, Tracey Anderson, Delia Chatterfield, Aishah George, Rita Gonsalves, Maria Gonsalves-Perkins, Wynona Harper, Tamika Morales, Cheryl Pedro, Rosalind Pichardo, Ceasefire Pennsylvania Education Fund, and The City of Philadelphia, : : : : : : : : : : : : |
| Petitioners : |
| : No. 562 M.D. 2020 |
| v. : |
| : Argued: June 9, 2021 |
| The Commonwealth of Pennsylvania, The Pennsylvania General Assembly, Bryan Cutler, in his official capacity as Speaker of The Pennsylvania House of Representatives, and Jake Corman, in his official capacity as President Pro Tempore of the Pennsylvania Senate, : : : : : : : : : : |
| Respondents : |

BEFORE: HONORABLE RENÉE COHN JUBELIRER, Judge[1]
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE MICHAEL H. WOJCIK, Judge
HONORABLE CHRISTINE FIZZANO CANNON, Judge
HONORABLE ELLEN CEISLER, Judge

---

[1] This case was assigned to the opinion writer before January 7, 2022, when Judge Cohn Jubelirer became President Judge.

# OPINION ANNOUNCING THE JUDGMENT OF THE COURT[2]

BY JUDGE McCULLOUGH                      FILED: May 26, 2022

In our original jurisdiction, certain residents of the City of Philadelphia, the City of Pittsburgh, and/or their adjacent communities (Petitioner Citizens),[3] Ceasefire Pennsylvania Education Fund (Petitioner CeaseFire), and the City of Philadelphia (Petitioner City) (collectively, Petitioners) filed a petition for review (PFR) on October 7, 2020, in the nature of a complaint seeking declaratory and injunctive relief. In the PFR, Petitioners named as respondents the Commonwealth of Pennsylvania (Respondent Commonwealth), the Pennsylvania General Assembly (Respondent General Assembly), Bryan Cutler, in his official capacity as Speaker of the Pennsylvania House of Representatives (Respondent Speaker), and Jake Corman, in his official capacity as President Pro Tempore of the Pennsylvania State Senate (Respondent President Pro Tempore) (collectively, Respondents).

In the PFR, Petitioners lodge novel legal challenges to the validity of Section 6120(a) of the Pennsylvania Uniform Firearms Act of 1995 (UFA), 18 Pa.C.S.

---

[2] After circulation and consideration by the full Court, this case proceeded to judicial conference in accordance with the Commonwealth Court's Internal Operating Procedures, and is being filed as a plurality opinion. 210 Pa.Code §69.256 ("If, pursuant to vote after judicial conference consideration, a majority of all of the Judges, as well as a majority of the Judges who heard the case or to whom it was submitted on briefs, favor the result reached in the circulated draft opinion, that opinion, together with any concurring or dissenting opinions and notations of concurrences or dissents, shall be filed.").

[3] Petitioner Citizens are Stanley Crawford, Tracey Anderson, Delia Chatterfield, Aishah George, Rita Gonsalves, Maria Gonsalves-Perkins, Wynona Harper, Tamika Morales, Cheryl Pedro, and Rosalind Pichardo.

§6120(a),[4] and, to a much lesser extent, Section 2962(g) of the Home Rule Charter and Optional Plans Law (Home Rule Law), 53 Pa.C.S. §2962(g)[5] (together, Firearm Preemption Statutes). As a general matter, these statutes vest the General Assembly with the sole power to legislate in the field of firearm regulation and preempt and/or prohibit all political subdivisions from enacting local laws that encroach into that area.[6] More specifically, Petitioners assert that Respondents, in enacting the Firearm Preemption Statutes and failing to revise those statutes to permit municipal regulation of firearms at the local level, engaged in unlawful conduct. On this basis, Petitioners enumerate three causes of action: the first is based on the state-created danger doctrine, the second asserts a violation of substantive due process, and the third is dubbed interference with statutory delegation of powers.

Respondents have filed various preliminary objections to the PFR. Respondent Commonwealth asserts that Petitioners lack standing and failed to state a

---

[4] Section 6120 of the UFA is titled, "Limitation on the regulation of firearms and ammunition," and subsection (a) pronounces a relatively straightforward command: "No county, municipality or township may *in any manner* regulate the lawful ownership, possession, transfer or transportation of firearms, ammunition or ammunition components when carried or transported for purposes not prohibited by the laws of this Commonwealth." 18 Pa.C.S. §6120(a) (emphasis added).

[5] 53 Pa.C.S. §§2901-2984. Section 2962(g) of the Home Rule Law states that "[a] municipality shall not enact any ordinance or take any other action *dealing with* the regulation of the transfer, ownership, transportation[,] or possession of firearms." 53 Pa.C.S. §2962(g) (emphasis added).

[6] *See, e.g.*, *Commonwealth v. Ortiz*, 681 A.2d 152, 156 (Pa. 1996); *Firearm Owners Against Crime v. Lower Merion Township*, 151 A.3d 1172, 1179 (Pa. Cmwlth. 2016); *Dillon v. City of Erie*, 83 A.3d 467, 473 (Pa. Cmwlth. 2014); *National Rifle Association v. City of Philadelphia*, 977 A.2d 78, 82 (Pa. Cmwlth. 2009) *(en banc)*, *overruled on other grounds by Firearm Owners Against Crime v. City of Harrisburg, Mayor Eric Papenfuse*, 218 A.3d 497, 511-13 (Pa. Cmwlth. 2019) (*en banc*), *appeal granted in part and denied in part*, 230 A.3d 1012 (Pa. 2020); *Clarke v. House of Representatives*, 957 A.2d 361, 364 (Pa. Cmwlth. 2008); *Schneck v. City of Philadelphia*, 383 A.2d 227, 229-30 (Pa. Cmwlth. 1978).

claim upon which relief may be granted. Respondent General Assembly argues that Petitioners failed to state a claim upon which relief may be granted and that their claims are not ripe for review. Similarly, Respondent Speaker contends that Petitioners lack standing, and that their claims are not ripe, are barred by collateral estoppel, and are legally insufficient. For his part, Respondent President Pro Tempore maintains that Petitioners lack standing to pursue their claims, and that their claims are not ripe for review, are barred by res judicata, are non-justiciable, and are not otherwise legally cognizable. Respondent President Pro Tempore further objects to the PFR on the ground that certain allegations contain scandalous or impertinent matter and should be stricken as such.

In turn, Petitioners filed separate answers to each of Respondents' preliminary objections. Thereafter, the individual Respondents filed their own briefs in support of their preliminary objections, and Petitioners filed a global brief in opposition to all of Respondents' preliminary objections. Petitioners and Respondents then filed reply briefs. Meanwhile, numerous entities and/or individuals filed *amicus curiae* briefs in support of both Petitioners and Respondents.[7] On May 7, 2020, we entered a *per curiam* order scheduling oral argument before the Court, sitting *en banc*, on June 9, 2021. This Court held argument on that date, and Respondents' preliminary objections are now ripe for disposition.

Upon review, and for the foregoing reasons, we conclude that Petitioners have failed to set forth a claim upon which relief may be granted. Accordingly, we sustain Respondents' preliminary objections that challenge the legal sufficiency of the

---

[7] Namely, briefs were filed by Gun Owners of America, Inc., Gun Owners Foundation, the Heller Foundation, and Conservative Legal Defense and Education Fund, Brady and Giffords Law Center to Prevent Gun Violence, the City of Pittsburgh, the City of Harrisburg, the County and Local Governments, and individual medical doctors and the Coalition of Trauma Centers for Firearm Injury Prevention.

counts in the PFR and dismiss the PFR with prejudice.

## I.  The PFR

In the PFR, Petitioners aver where the individual Petitioner Citizens have lived, *i.e.*, most reside in the City of Philadelphia, a few in the City of Pittsburgh, and one in a township adjacent to the City of Pittsburgh, and describe the events of gun violence that has affected them.  Petitioner Citizens generally allege that, as a result of these events, they have suffered emotional distress, anxiety, grief, and/or have lived in a state of fear of gun violence in their communities.  Petitioner Citizens represent that nearly all of them are Black, Hispanic, or a combination of both, and allege that the incidents of gun violence that have impacted their lives took place in poverty-stricken areas that have a high crime rate.  (PFR ¶¶9-18.)

Petitioner CeaseFire "is a Pennsylvania nonprofit organization headquartered in [Petitioner City]," and its "mission is to end the epidemic of gun violence across the Commonwealth of Pennsylvania through education, coalition building, and advocacy in support of sensible gun laws and public policies."  (PFR ¶¶19-20.)

Petitioner City "is a municipal corporation and political subdivision of the Commonwealth of Pennsylvania." (PFR ¶21.)  Petitioner City "is a Home Rule Municipality organized and existing under the [Home Rule Law]," "is a city of the first class by statutory designation," and "is coextensive with the County of Philadelphia, a county of the first class." (PFR ¶22.)  According to the PFR, Petitioner City

> is home to almost 1.6 million residents.  [The City of] Philadelphia's residents include many communities of color and low-income communities, groups that are especially vulnerable to the harms caused by gun violence.  [The City of] Philadelphia has a poverty rate of 24.3%[,] 43.6% of Philadelphians identify as Black or African American[,] and 15.2% of Philadelphians identify as Hispanic or Latino.

5

(PFR ¶23.)

In the PFR, Petitioners aver that they "have been directly affected by gun violence and continue to be threatened and harmed by gun violence every day." (PFR Sec. II.) Petitioner Citizens "have lost loved ones to gun violence," "grapple daily with the trauma of those injuries," and "live in fear of the next episode of gun violence that will be visited on them and their families." (PFR ¶40.) Petitioner CeaseFire alleges that the Firearm Preemption Statutes "have impaired and continue to impair [its] ability to . . . advance a broad range of effective, evidence-based local gun regulations"; Petitioner CeaseFire "has been forced to divert time, funding, and resources to mitigate the harmful consequences of the Firearm Preemption [Statutes]"; and the Firearm Preemption Statutes "have frustrated [its] mission to obtain passage of sensible gun laws by disrupting its efforts to work with the communities most affected by gun violence and to advance local regulations that would prevent gun violence and save lives." (PFR ¶¶40, 45, 47-48.) Otherwise, Petitioner City alleges that it "bears a significant economic burden associated with gun violence." (PFR ¶51.) However, Petitioner City then lists costs that apparently would be incurred by individuals and not the City of Philadelphia itself, contending that "[a] firearm homicide is associated with an estimated average cost of $1.42 million due to medical expenses, lost earnings/productivity, property damage, and criminal justice costs," and maintaining that, "[o]n average, a non-fatal firearm-related injury costs $46,632 in medical expenses and lost productivity." (PFR ¶51.) Petitioner City further avers that the Firearm Preemption Statutes "infringe upon [the City of] Philadelphia's interests and functions as a governing entity, including its responsibility to protect the health, safety, and quality of life of its citizens." (PFR ¶53.)

6

The PFR then delves into a general exposition on gun violence, particularly in the Cities of Philadelphia and Pittsburgh, and alleges that gun violence has a disparate impact on African-American and Hispanic ethnicities who live in low-income areas and/or areas with a high crime rate. The PFR contains the following averments:

> 28. Gun violence in Pennsylvania is a public health crisis in which Respondents have actively played a key role….
>
> . . . .
>
> 39. The gun violence epidemic in Pittsburgh, like Philadelphia, disproportionately affects Pittsburgh's Black residents. . . .

(PFR ¶¶28, 39) (footnotes and citations omitted).

Next, the PFR highlights and emphasizes floor debate and discussion among representatives of the General Assembly with regard to the Firearm Preemption Statutes, averring, overall, that "[i]n passing, amending, expanding, and enforcing the Firearm Preemption [Statutes], Respondents have disregarded the evidence showing that [the statutes] exacerbate the gun violence epidemic." (PFR Sec. IV.)

The PFR also provides a chronological background of the legislative history and developments of the Firearm Preemption Statutes. The most relevant averments are as follows:

> 63. When the bill that would become Section 6120 [of the UFA] was first introduced, it permitted [the City of] Philadelphia to continue implementing its own gun safety laws (except with regards to hunters in transit). . . . Nevertheless, the final amended version preempted many life-saving gun[-]safety law[s] that might be passed in the City of Philadelphia as well.

7

. . . .

67.     Since the initial passage of Section 6120, the General Assembly has continued to enact amendments, all of which further restrict the ability of local governments to protect their residents from gun violence, [and] all the while continuing to disregard evidence before it, and available to it, showing the harmful effects of preemption and/or the benefits of certain gun ordinances.

68.     In 1987, the General Assembly passed an amendment to Section 6120 that further barred local regulation [by] expanding Section 6120(a) to include preemption of ordinances that would regulate ammunition and ammunition components.

69.     In 1993, the General Assembly passed yet another amendment to Section 6120, this time providing for a more expansive definition of the word "firearms," and thus effectively expanding the categories of weapons that local governments were prohibited from regulating. . . .

. . . .

78.     In 1996, the General Assembly [enacted Section 2962(g) of Home Rule Law,] which applies to all municipalities except Philadelphia, and states:     "A municipality shall not enact any  ordinance or take any other action dealing with the regulation of the transfer, ownership, transportation or possession of firearms." [53 Pa.C.S. §2962(g).] Thus, whereas Section 6120's scope is limited to regulations of the "lawful" transfer, ownership, transportation, or possession of firearms, and only when firearms are "carried or transported for purposes not prohibited by the laws of this Commonwealth," Section 2962(g) is not so limited.[8]

79.     In 1999, the General Assembly . . . amended Section 6120 to prohibit municipalities from "[b]ring[ing] or maintain[ing] an action at law or in equity against any firearms or ammunition manufacturer, trade association or

---

[8] *See supra* notes 4 and 5.

8

dealer for damages, abatement, injunctive relief or any other relief or remedy resulting from or relating to either the lawful design or manufacture of firearms or ammunition or the lawful marketing or sale of firearms or ammunition to the public." Members of the General Assembly warned of the damaging results of the General Assembly's actions; the General Assembly ignored these warnings.

. . . .

83. In 2013, [House Bill (HB)] 80 was introduced to address theft of "secondary metal." By the time of final passage, the General Assembly had revised the bill dramatically, such that it also provided a right of action in court by any individual "adversely affected" by an ordinance prohibited under Section 6120 or Section 2962(g) to bring suit in court.[9]

84. When the provision related to Section 6120 was discussed, members of the House expounded on the gun violence epidemic in Pennsylvania. The General Assembly once again disregarded this information.

. . . .

88. In addition to passing amendments to Section 6120, the General Assembly has on several occasions refused to narrow or repeal Section 6120, despite its own awareness that Petitioners are suffering extensive and tangible harm as a result of the Firearm Preemption [Statutes]. For example, the following bills narrowing or repealing the Firearm Preemption [Statutes] have been proposed to the General Assembly, and none have received so much as a floor vote: HB 739 of 2001, HB 1036 of 2001, HB 1841 of 2001, HB 1842 of 2001, HB 874 of 2005, HB 2483 of 2006, HB 2955 of 2006, HB 18 of 2007, HB 23 of 2007, HB 25 of 2007, HB 485 of 2007, HB 1044 of 2009, and SB 176 of 2011, SB 192

---

[9] However, as recognized by Petitioners, after HB 80 was passed, the provision amending Section 6120 and providing for a private right of action was invalidated as unconstitutional on single-subject rule grounds by the Pennsylvania Supreme Court in *Leach v. Commonwealth*, 141 A.3d 426 (Pa. 2016).

of 2013, HB 2611 of 2018, SB 625 of 2019, HB 2291 of 2020.

89.    [Respondent] Commonwealth has prevented, and continues to prevent, [the City of] Philadelphia and other municipalities from passing and enforcing ordinances via the Firearm Preemption [Statutes].  Meanwhile, municipalities, organizations, and individual constituents continue to suffer.

(PFR ¶¶63, 67-69, 78-79, 83-84, 88-89) (footnotes and citations omitted).

From these averments, the PFR alleges that "[s]ince its passage, Section 6120 has operated to restrict local municipalities in their ability to protect their citizens and address the particularized safety concerns of these municipalities and neighborhoods within these municipalities," and that the "statute endangers the lives of [] Petitioners and others in their communities by effectively preventing local municipalities from fulfilling their core duties to protect the health and safety of their residents." (PFR ¶¶54-55.)  In addition, the PFR avers that "the General Assembly has continued to amend Section 6120, and with each amendment, the General Assembly has further restricted the ability of municipalities like Philadelphia to address gun violence"; the General Assembly "has repeatedly blocked any attempt to loosen preemption restrictions, while steadfastly refusing to act to curb gun violence at the state level"; "and by its actions, the General Assembly has exposed [Petitioner Citizens] to [a] direct risk of gun violence."  (PFR ¶55.)  According to the PFR, the Firearm Preemption Statutes have "prevented [the City of] Philadelphia and other Pennsylvania municipalities from enforcing the ordinances they have passed to make their residents safer," and these statutes, "coupled with [the General Assembly's] refusal to pass evidence-based gun safety legislation on the state level, operate to actively prevent an effective gun safety approach that would save the lives, property, and bodily integrity of Pennsylvania residents, particularly in low-income neighborhoods in the largest cities." (PFR ¶¶56-57.)  Additionally, the PFR, citing

10

case law from the appellate courts of this Commonwealth, correctly notes that Section 6120 has been "held to preempt enforcement of [the City of] Philadelphia's ordinance requiring a license to acquire a firearm within the city or bring a firearm into Philadelphia," as well as "several other firearm-related ordinances enacted by the City of Philadelphia, including ordinances that prohibited straw purchasing of guns, limited handgun purchases to one per month, required annual renewal of the firearm license, prohibited persons subject to protection from abuse orders from acquiring firearms, and prohibited the possession or transfer of assault weapons."[10]   (PFR ¶60) (citations omitted).

Proceeding along these lines, the PFR posits that "[b]ut for the Firearm Preemption [Statutes], the City of Philadelphia and other municipalities *would* pass their own safety ordinances that *would* prevent or mitigate the harm suffered by their residents, including [Petitioner Citizens]."  (PFR ¶91) (emphasis added).  Providing examples, the PFR asserts that Petitioner City would pass three certain types of ordinances, including one that would impose "permit-to-purchase requirements."  In this regard, the PFR contends:

> 94.    Pennsylvania currently requires only that a potential firearm purchaser pass a background check in order to purchase a firearm. It does not require a permit to purchase a firearm. Permit-to-purchase systems involve an application to a state or local law enforcement agency and a background check that is often facilitated by fingerprints. Law enforcement has, on average, 30 days to complete the check. Sellers, both licensed and private, can only sell to a potential firearm purchaser with a valid license.

(PFR ¶94) (footnotes and citations omitted).

---

[10] *See supra* note 5.

11

The PFR also states that Petitioner City would enact an ordinance imposing "one-gun-per-month limits." The PFR claims that

> 106. Pennsylvania does not currently limit the number of firearms an individual may purchase within a certain time period.
>
> 107. States that implement a waiting period between purchases of handguns have experienced dramatic reductions of gun violence, the prevalence of straw purchases, and gun trafficking.
>
> . . . .
>
> 112. Allowing Philadelphia and other municipalities to pass one-gun-per-month laws within their boundaries *would* save lives . . . .
>
> 113. If not for [] Respondents' actions in passing and perpetually voting to keep the Firearm Preemption [Statutes] in place, Philadelphia and other municipalities would have the ability to pass local one-gun-per-month ordinances.

(PFR ¶¶106-07, 112-13) (emphasis added).

Finally, the PFR maintains that Petitioner City would enact an ordinance that would permit "extreme risk protection orders" (ERPO), contending that "Pennsylvania does not have any procedures for disarming firearm owners who pose an extreme risk of physical harm to themselves or others." (PFR ¶116.) The PFR further avers that

> 117. Implementing procedures for an [ERPO] would allow law enforcement to proactively prevent gun[-]related tragedies before they occur. An ERPO allows families, household members, or law enforcement officers to petition a court directly for an ERPO which temporarily restricts a person's access to guns.

(PFR ¶117.)

12

Ultimately, the PFR maintains that "[b]y preventing the passage of regulations like permit-to-purchase requirements, one-gun-per-month limits, and ERPO ordinances, Respondents have increased the risks of gun violence in Petitioners' communities." (PFR ¶126.) The PFR states that "[c]rime-gun-trace data collected by the Pennsylvania Attorney General's office demonstrate[s] that these kinds of regulations would reduce the risk of gun violence if enacted at the local level," because "[t]he majority of guns used in crimes in [the City of] Philadelphia (and in Pennsylvania more broadly) are from dealers in Pennsylvania, with a plurality of guns used in crimes in [the City of] Philadelphia coming from dealers within [the] City limits"; thus, the PFR asserts that the Firearm Preemption Statutes "prevent [the City of] Philadelphia from addressing significant sources of guns used in crimes." (PFR ¶127.) Further, the PFR contends that, due to the Firearm Preemption Statutes, Petitioner Citizens "and their loved ones are more likely to suffer death or serious bodily injury from gun violence," and "[the City of] Philadelphia's residents in vulnerable Black and Hispanic communities are more likely to suffer death or serious bodily injury from gun violence." (PFR ¶¶128-29.) The PFR reiterates that "[t]he greatest increases in the risks of gun violence as a result of the Firearm Preemption [Statutes] are in Black and Hispanic low-income urban communities like those in areas of [the City of] Philadelphia." (PFR ¶130.)

Based on these allegations, the PFR asserts three causes of action. In count I, the PFR advances a claim under the state-created danger doctrine. In this vein, the PFR contends that "Respondents have affirmatively used their authority in a way that renders Petitioners more vulnerable to gun violence than had Respondents not acted at all" and "acted with a degree of culpability that shocks the conscience and with deliberate indifference and/or recklessness." (PFR ¶¶133-34.) In addition, the PFR

13

states that "Petitioners are foreseeable victims of Respondents' acts and/or [are] members of a discrete class of persons subjected to the potential harm brought about by Respondents' actions" and, further, "have suffered harm that is the foreseeable and a fairly direct result of Respondents' actions." (PFR ¶¶135-36.)

In count II, the PFR sets forth a substantive due process claim, asserting that "[t]he Firearm Preemption [Statutes] violate [a]rticle I, [s]ection 1 [of the Pennsylvania Constitution[11]], as they do not bear a real and substantial relation to a legitimate government purpose." (PFR ¶142.)

In count III, which is denoted as a claim for "interference with delegation," the PFR states that "[t]he Commonwealth has the obligation to maintain order and to preserve the safety and welfare of all citizens" and "has delegated portions of that obligation to its political subdivisions," and "[t]his delegation imposes on local health authorities, including [Petitioner City's] health department, the responsibility for the ills of gun violence." (PFR ¶¶145-46.) The PFR avers that "[i]t is the responsibility of the Commonwealth to provide [the City of] Philadelphia and other municipalities with reasonable powers with which to discharge their delegated responsibilities, including the delegated responsibility to address gun violence," and "[t]he General Assembly's enactment of the Firearm Preemption [Statutes] [has] deprive[d] [the City of] Philadelphia of the ability to fulfill its delegated duty to address gun violence." (PFR ¶¶149-50.) Moreover, the PFR alleges that "the General Assembly's enactment and continuation of the Firearm Preemption [Statutes], combined with the General Assembly's failure to enact adequate statewide firearm regulations, violates the Commonwealth's obligation to maintain order and to preserve the safety and welfare of all citizens," reasoning that "[t]he General Assembly cannot enforce the Firearm

---

[11] Pa. Const. art. I, §1.

14

Preemption [Statutes] against [the City of] Philadelphia while delegating [it] the responsibility to address gun violence." (PFR ¶151.)

For relief, Petitioners seek "a declaration that Respondents' actions violate [a]rticle I, [s]ection I of the Pennsylvania Constitution and a permanent injunction preventing further enforcement of the Firearm Preemption [Statutes]." (PFR ¶¶138, 144.) Petitioner City also asks for a declaration stating "that by depriving [it] of the ability to fulfill its delegated duties to address gun violence," "Respondents have violated the Commonwealth's obligation to maintain order and to preserve the safety and welfare of all citizens" and request "a permanent injunction preventing further enforcement of the Firearm Preemption [Statutes]." (PFR ¶152.) Finally, Petitioners apply for a declaration that "Respondents have violated [a]rticle I, [s]ection 1 of the Pennsylvania Constitution" by "prohibiting the City of Philadelphia from enacting firearm regulations[,] such as permit-to-purchase ordinances, one-gun-per-month limits, and extreme risk protection laws." (PFR ¶153.)

## II. Discussion

As noted above, Respondents have filed preliminary objections to the PFR, one of which is that all three counts in the PFR have failed to state a valid cause of action as a matter of law, which is known in Pennsylvania as a "demurrer." At this point in time, it is well settled that, "[i]n ruling on preliminary objections in the nature of a demurrer, the Court must accept as true all well-pleaded material facts and all inferences reasonably deducible therefrom. However, the Court is not required to accept as true legal conclusions, unwarranted factual inferences, argumentative allegations, or expressions of opinion." *Shore v. Pennsylvania Department of Corrections*, 168 A.3d 374, 378-79 (Pa. Cmwlth. 2017) (internal citations omitted). For preliminary objections in the nature of a demurrer to be sustained, "it must appear

15

with certainty that the law will permit no recovery, and any doubt must be resolved in favor of the non-moving party." *Gregory v. Pennsylvania State Police*, 160 A.3d 274, 276 (Pa. Cmwlth. 2017) (internal citations omitted).

## A. State-Created Danger Doctrine

In their briefs, Respondents contend, among other things, that Petitioners failed to plead a viable claim under the state-created danger doctrine because the theory has never been used to nullify a state statute. Respondents further assert that, in failing to pass the legislation that Petitioners desire, Respondents did not engage in an affirmative act, which is required to invoke the protections of substantive due process under the state-created danger doctrine. Somewhat similarly, Respondents assert that Petitioners' claim fails because a state may not be held liable for risks that generally affect the public at large, and none of the Petitioners belong to a discrete and identifiable class of individuals who face a peculiar risk that is distinguishable from a risk that is posed to the general public.

In response, Petitioners contend that the state-created danger doctrine imposes a duty on Respondents to protect Pennsylvania citizens if Respondents' own actions create or enhance a danger toward the citizens, and this includes taking legislative action that increases the risk or opportunity for gun violence. Petitioners argue that the General Assembly was consciously aware that the Firearm Preemption Statutes would result (and have resulted) in an increase in gun deaths in the Cities of Philadelphia and Pittsburgh, namely in the low-income and/or high crime areas, and assert that Respondents acted affirmatively, in that they repeatedly amended Section 6120 of the UFA to make it more expansive in its preemptive reach. In Petitioners' view, the Petitioner Citizens constitute a defined class of individuals, for purposes of the state-created danger doctrine, because they are members of communities and

16

ethnicities "that bear a tragically disproportionate share of the scourge of gun violence." (Pet'rs' Br. at 54-55.) Further, Petitioners contend that a statute cannot be immunized from the state-created danger doctrine because the doctrine originates from the due process clauses of the United States (U.S.) and Pennsylvania Constitutions. Petitioners maintain that all official legislative activity, like executive action, is bound by constitutional restraints and, thus, the Firearm Preemption Statutes are subject to review under the state-created danger doctrine.

In terms of the substantive component of the due process clause, whether it be per the Fourteenth Amendment of the U.S. Constitution, U.S. Const. amend. XIV, or article I, section 1 of the Pennsylvania Constitution, Pa. Const. art. I, §1, and its corollary sections, a legal theory has developed that is commonly known as the state-created danger doctrine. *See Johnston v. Township of Plumcreek*, 859 A.2d 7, 12-13 & n.16 (Pa. Cmwlth. 2004). In *Johnston*, a panel of this Court entertained an appeal by landowners who challenged the constitutionality of a township's ordinances that required them to connect to the public water system. The landowners "asserted that as a result of the terrorist attacks on September 11, 2001, and the nation's war on terrorism, there [was] a real and present danger of terrorist attacks on public water systems" and "alleged that the [township's] [w]ater [a]uthority [was] not in a position to protect its customers . . . from having their water poisoned by chemical or biological contaminants." *Id.* at 9. The court of common pleas dismissed the claim on preliminary objections, and, on appeal, the landowners contended, among other arguments, that the court below "erred in failing to recognize the right of every individual to provide for his protection from life threatening incidents." *Id.* at 10 (internal quotation marks omitted). Construing the landowners' claim to be "one that fell under the 'state-created' danger theory," this Court concluded that the landowners' cause of action was

17

meritless. *Id.* at 13. In so deciding, we researched the area of law governing the state-created danger doctrine and, upon our review, stated: "[A]s far as can be determined, the 'state-created danger' body of jurisprudence has never been used to nullify a statute or ordinance." *Id.* Although this Court eventually addressed the landowners' claim in the alternative, based on the assumption that the state-created danger doctrine could render a statute unconstitutional, we inevitably upheld the decision of the court of common pleas with the following clear statement: "Most importantly, the state-created danger theory is a construct by which damages are awarded for constitutional torts. It is not used to nullify statutory law, and we will not do so here." *Id.* at 14.

Notably, in their brief, Petitioners have failed to cite a case in a jurisdiction within the United States that refutes the proposition of law and holding enunciated in our decision in *Johnston*. Based upon our own independent research, we have been unable to unearth such a case. Following *Johnston* as binding precedent, this Court, therefore, could summarily dispose of Petitioners' state-created danger claim on the valid and independent ground that the legal theory cannot be utilized as the means by which to declare the Firearm Preemption Statutes unconstitutional.[12] While we preserve this reasoning as a legal basis for our conclusion in the event of a further appeal, this Court will nonetheless proceed to address Petitioners' claim on alternative grounds.

The United States Supreme Court has emphasized that the Due Process Clause does not guarantee minimum levels of safety or security, *see Collins v. City of Harker Heights*, 503 U.S. 115, 126-27 (1992), and it is generally settled that there is no constitutional duty on the part of the state to protect members of the public at large

---

[12] *See Commonwealth v. Markman*, 916 A.2d 586, 606 (Pa. 2007) ("Where a decision rests on two or more grounds equally valid, none may be relegated to the inferior status of *obiter dictum*.") (internal citation omitted).

from crime, *see Martinez v. California*, 444 U.S. 277, 284-85 (1980).  Indeed, "[t]he Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order." *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982).

In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment does not impose on the state an affirmative duty to protect individuals against private acts of violence.  *Id.* at 197.  "The [D]ue [P]rocess [C]lause generally confers no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests . . . . Mere indifference or inaction in the face of private violence cannot support a substantive due process claim." *Wilson-Trattner v. Campbell*, 863 F.3d 589, 593 & 596 (7th Cir. 2017) (internal citations and quotation marks omitted).  Similarly, a "passive failure to stop private violence" will not suffice to establish a state-created danger, *Pena v. DePrisco*, 432 F.3d 98, 110 (2d Cir. 2005), and "[i]t is not enough to allege that a government actor failed to protect an individual from a known danger of bodily harm," *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007).

Nonetheless, our Supreme Court and the United States Court of Appeals for the Third Circuit, as well as other federal circuit courts of appeals, recognize a caveat called the "state-created danger" doctrine.  *See R.W. v. Manzek*, 888 A.2d 740, 743 (Pa. 2005); *Kneipp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996).  That exception provides that "the Due Process Clause can impose an affirmative duty to protect if the state's own actions create the very danger that causes the plaintiff's injury." *Morrow v. Balaski*, 719 F.3d 160, 167 (3d Cir. 2013).

19

To prevail on a substantive due process claim under the state-created danger doctrine, a petitioner must prove each of the following elements: (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the petitioner existed such that the petitioner was a foreseeable victim of the respondents' acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that had rendered the citizen more vulnerable to danger than had the state not acted at all. *Henry v. City of Erie*, 728 F.3d 275, 281-82 (3d Cir. 2013) (citing *Morrow*, 719 F.3d at 177).

Undoubtedly, "many state activities have the potential to increase an individual's risk of harm" by private actors, *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998), and, in one way or another, "[a]ll government activities involve some risk; for example, motorists are killed each year on state highways." *Johnston*, 859 A.2d at 13. Consequently, "[i]t cannot be that the state . . . 'creates a danger' every time it does anything that makes injury at the hands of a third party more likely. If so, the state would be liable for every crime committed by the prisoners it released." *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015). As the Third Circuit put it: "If a municipality, state[,] or other public body is to be liable under the Constitution for harm caused by private parties to persons not in [state] custody, the liability would be unlimited. There is no legal doctrine that supports imposition of such liability." *Bennett ex rel. Irvine v. City of Philadelphia*, 499 F.3d 281, 289-90 (3d Cir. 2007); *see also Rivera v. Rhode Island*, 402 F.3d 27, 37 (1st Cir. 2005) ("[M]erely rendering a person more vulnerable to risk does not create a constitutional duty to protect.").

By its very nature, the legal concept of foreseeability is designed to curtail the state-created danger doctrine from an unfathomable reach. The third element of the state-created danger doctrine—the "foreseeable victim" element—is closely related to the first element, which requires that the alleged danger, here, gun violence, be foreseeable in terms of legal causation. In particular, the third element asks whether there is a sufficiently close relationship between the state and the petitioner to make the petitioner a "foreseeable victim of the [respondents'] acts in a tort sense," either "individually or as a member of a distinct class." *Hopkins v. Yesser*, 412 F. Supp. 3d 517, 523 (E.D. Pa. 2019). The relationship may exist when the respondents have knowledge that either "(1) a specific individual has been placed in harm's way" or (2) the petitioner "[is] part of an identifiable and discrete class of persons subject to the harm the state allegedly has created." *Morse v. Lower Merion School District*, 132 F.3d 902, 914 (3d Cir. 1997).

Summarizing the law of the Third Circuit, a federal district court for the Eastern District of Pennsylvania ably stated:

> The "primary focus" of the third element is foreseeability. But in the "discrete class" analysis, foreseeability by itself is not enough. In addition, the group must be limited enough to remain separate from the general public. This requirement prevents the state-created danger exception from swallowing the general rule that the state is not obligated to protect its citizens from random, violent acts of private parties.
>
> . . . .
>
> A class cannot be "discrete" and "limited" unless it is "identifiable." To be "identifiable," the class must have clearly defined outer boundaries or membership criteria. This requirement makes logical sense: foreseeability is the "primary focus" of the third element, but a class cannot be foreseeable if it is not clearly defined. And a class without

21

clearly discernible limits raises an intolerable risk of bleeding into the "public at large."

. . . .

A "discrete class" must [also] face a "particular threat" separate from that shared by the general public.

*Hopkins*, 412 F. Supp. 3d at 523-28 (internal citations and some internal quotation marks omitted).

Importantly, "[w]here the state actor has allegedly created a danger towards the public generally, rather than an individual or group of individuals, holding a state actor liable for the injuries of foreseeable [petitioners] would expand the scope of the state-created danger theory beyond its useful and intended limits." *Morse*, 132 F.3d at 913 n.12. In the words of the United States Court of Appeals for the Sixth Circuit: "In the only cases where we have recognized a 'state[-]created danger,' the government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims." *Jones v. Reynolds*, 438 F.3d 685, 696 (6th Cir. 2006). Further, the United States Court of Appeals for the Fifth Circuit has said: "We have consistently cautioned against finding liability under the state-created danger theory based upon an ineffective policy or practice in cases where the [petitioner's] injury is inflicted by a private actor." *Doe ex rel. Magee v. Covington County School District*, 675 F.3d 849, 866 (5th Cir. 2012) (*en banc*).

In *Mark v. Borough of Hatboro*, 51 F.3d 1137 (3d Cir. 1995), a member of a volunteer fire department, while acting as a private citizen, set fire to the plaintiff's auto repair business. The plaintiff alleged that the state actors' "failure to follow adequate policies to ensure that applicants to the fire department were screened sufficiently for tendencies towards arson caused the damage to his property." *Id.* at

1140. On appeal, the Third Circuit affirmed the grant of summary judgment in favor of the defendants. In so determining, the court observed:

> In *Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989), *cert. denied*, 498 U.S. 938 (1990), . . . a state trooper, after arresting the driver of a car and impounding the car, left the driver's female passenger stranded alone in a neighborhood with the highest aggravated crime rate in the county at 2:30 A.M. The plaintiff was raped. The court held that the plaintiff "has raised a genuine issue of fact tending to show that [the trooper] acted with deliberate indifference to [plaintiff's] interest in personal security under the [F]ourteenth [A]mendment." *Id.* at 588. In *Cornelius v. Town of Highland Lake*, 880 F.2d 348 (11th Cir. 1989), *cert. denied*, 494 U.S. 1066 (1990), . . . the state allowed a prisoner with a history of committing violent crimes to participate in a work release program where he had access to "axes, picks, machetes, knives and saws," and was supervised only by an unarmed civilian member of the community. The inmate abducted the town clerk at knife point and held her hostage for three days, during which time he threatened to abuse her sexually and physically and to kill her. *Id.* at 350. . . . [I]n *Cornelius,* the plaintiff introduced evidence that the defendants who employed her exercised a control over her work environment that arguably was sufficient to create a special, quasi-custodial relationship between them.
>
> . . . .
>
> The cases where the state-created danger theory was applied were based on discrete, grossly reckless acts committed by the state or state actors using their peculiar positions as state actors, leaving a discrete plaintiff vulnerable to foreseeable injury. In *Wood*, for example, the woman eventually was raped, and the court held that a jury could find that the officer, using his power as an officer, placed the plaintiff in a situation entailing a foreseeable risk of danger. Indeed, assuming the facts are true, it would be unfair to say that the state actor was not responsible for the rape.

23

But this case is not like those cases at all. When the alleged unlawful act is a policy directed at the public at large—namely a failure to protect the public by failing adequately to screen applicants for membership in a volunteer fire company—the rationale behind the rule disappears—there can be no specific knowledge by the defendant of the particular plaintiff's condition, and there is no relationship between the defendant and the plaintiff. Therefore, we cannot say that an oppressive act of the defendants, made possible by virtue of the fact that they were acting in a public capacity, caused [the plaintiff's] injury.

*Mark*, 51 F.3d at 1152-53 (some internal citations omitted).

In *Rivera v. Houston Independent School District*, 349 F.3d 244 (5th Cir. 2003), the Fifth Circuit rejected a state-created danger claim against a school district after a student died as a result of gang-related violence. The court explained:

[T]o hold [the school district] responsible for the ultimate ineffectiveness of [its policies designed to combat gang violence] would turn the Due Process Clause's limited duty of care and protection into a guarantee of shelter from private violence. This result would be inimical to the Supreme Court's conclusion [in *DeShaney*] that the Due Process Clause does not require the State to protect individuals from private violence.

349 F.3d at 250.

In *Ruiz v. McDonnell*, 299 F.3d 1173 (10th Cir. 2002), a mother enrolled her child in a state-licensed home daycare. The operator of the daycare literally abused the child to death. The mother brought suit against the state's human services department and its director, alleging that their act of licensing the provider, which failed to meet state requirements for licensure, violated her deceased son's right to substantive due process pursuant to the state-created danger doctrine. The United States Court of Appeals for the Tenth Circuit disagreed:

24

[W]e do not view the mere licensure of [the daycare] as constituting the requisite affirmative conduct necessary to state a viable [] claim. Specifically, the improper licensure did not impose an immediate threat of harm. Rather, it presented a threat of an indefinite range and duration. Moreover, the licensure affected the public at large; it was not aimed at [the child] or [his mother] directly . . . . [T]he mere licensure of [the daycare] was not an act directed at [the child] which, in and of itself, placed [the child] in danger.

*Id.* at 1183. Stated succinctly, in *Ruiz*, the court held that "negligence in licensing was not a sufficiently affirmative act under the standard set by *DeShaney* because it did not pose an immediate threat of harm and was directed at the public in general." *Gray v. University of Colorado Hospital Authority*, 672 F.3d 909, 922 (10th Cir. 2012) (internal citation omitted).

In *Gray*, the Tenth Circuit drew upon *Ruiz* and other decisions and formulated the following proposition of law:

[A] State's adoption of generally[]applicable policies and customs does not foist upon anyone an immediate threat of harm having a limited range and duration. The act of establishing such policies and customs itself does not put any particular individual at substantial risk of serious, immediate, and proximate harm. And because the act of establishing such policies and customs does not pose a direct threat to any one particular individual but affects a broader populace, we deem such act too remote to establish the necessary causal link between the danger to the victim and the resulting harm. In other words, the affirmative conduct required to support a danger creation claim should be directed at a discrete plaintiff.

*Gray*, 672 F.3d at 926 (internal citations and quotation marks omitted).

At bottom, the above recitation of the case law clearly establishes that a state cannot be found to have violated the state-created danger doctrine by enacting a statute and/or policy that is generally applicable, even if the statute and/or policy is arguably ineffective and fails to adequately protect the public from private acts of

25

violence. This is because such laws are inherently directed at the public in general and not at any specific individual or discrete class of individuals. Regardless of Petitioners' averments in the PFR, the UFA is a relatively comprehensive regulatory regime, containing protective measures designed to combat gun violence. Further, Section 6120(a) is equally applicable across and throughout this Commonwealth, applying to each and every county or municipality; thus, it is directed at the public at large and not toward any of the Petitioners in particular.

By way of background, the UFA lists numerous offenses, mostly felonious, drug-related, or violent in nature, and prohibits individuals who have been convicted of any one of these offenses from possessing a firearm. *See* 18 Pa.C.S. §6105. Generally, the UFA requires an individual to obtain a license to carry a firearm in a vehicle or concealed on or about his person or in public, and imposes restrictions on the sale or transfer of firearms, including a 48-hour waiting period and a criminal history and mental health background check. *See* 18 Pa.C.S. §§6106, 6109, and 6111. The UFA also contains licensing requirements for retailers and dealers of firearms, and outlaws the sale, transfer, or possession of certain bullets, including armor-piercing ammunition. *See* 18 Pa.C.S. §§6112-13. While carrying a "firearm" is presumptively lawful under the UFA, Section 908 of the Crimes Code makes it a criminal offense to use, possess, or sell an "offensive weapon"; pursuant to this statutory provision, most items that are required to be registered under the National Firearms Act (NFA),[13] such as machine guns, suppressors, short barreled rifles, and shotguns, are prohibited as "offensive weapons" unless they are registered under the NFA. *See generally* 18 Pa.C.S. §908.

---

[13] 26 U.S.C. §§5801-5872.

It is in this overall light that the preemption provision of Section 6120 must be viewed, read, and understood. The UFA creates uniform procedures and requirements for the selling and licensing of firearms, and designates which firearms, ammunition, and ammunition components will be or will not be lawful at the state level. In its command that "[n]o county, municipality or township may in any manner regulate the lawful ownership, possession, transfer or transportation of firearms, ammunition or ammunition components when carried or transported for purposes not prohibited by the laws of this Commonwealth," 18 Pa.C.S. §6120(a), Section 6120(a) is designed to guarantee consistency in firearm regulation from county to county, city to township, county to city, etc. In other words, in crafting Section 6120(a), it is readily apparent that it was the intention of our General Assembly to ensure that the citizens of the Commonwealth would not be subjected to varying and differing firearm regulations as they travel from town to town. Indeed, it would be difficult for a citizen to learn, memorize, or otherwise keep track of the firearm laws of every municipality in the Commonwealth. It would also be somewhat anomalous for a citizen to lawfully carry a concealed firearm on his/her side of the street, but to have that same firearm be deemed unlawful and/or improperly licensed when the citizen travels across the road and into another municipality to obtain groceries.

That said, Petitioners' claim under the state-created danger doctrine is a slippery one that is difficult to fully grasp and appreciate in the legal sense. To the extent Petitioners assert that the operational and functional structure of the UFA results in gun violence and that such violence constitutes a state-created danger, this assertion necessarily fails. Being a state statute that applies evenly to all of the municipalities in the Commonwealth, the UFA is targeted at the public in general. And, "[w]hen the alleged unlawful act is a policy directed at the public at large . . . the rationale behind

27

the [state-created danger] rule disappears—there can be no specific knowledge by [Respondents] of the particular [Petitioners'] condition, and there is no relationship between [Respondents] and [Petitioners]." *Mark*, 51 F.3d at 1152-53. In somewhat different language, "[a] State's adoption of generally[]applicable policies [] does not foist upon anyone an immediate threat of harm having a limited range and duration," and "[t]he act of establishing such policies [by] itself does not put any particular individual at substantial risk of serious, immediate, and proximate harm." *Gray*, 672 F.3d at 926.

Here, although Petitioner Citizens allege that their loved ones are victims of gun violence, the UFA does not actively promote, much less mandate, citizens to inflict harm upon each other with firearms, and "the Due Process Clause does not require the State to protect individuals from private violence." *Rivera*, 349 F.3d at 250. Insofar as Petitioners contend that the UFA does not adequately protect the public because it has a tendency to allow individuals with dangerous propensities to obtain a firearm and/or a firearm license, "improper licensure [does] not impose an immediate threat of harm" and, instead, "present[s] a threat of an indefinite range and duration." *Ruiz*, 299 F.3d at 1183. Indeed, by its nature, "negligence in licensing [is] directed at the public in general," *Gray*, 672 F.3d at 922, and it is "not aimed at [Petitioners] directly." *Ruiz*, 299 F.3d at 1183.

Moreover, inasmuch as Petitioners' averments could be construed as basing their claim on the proposition that Petitioner City, and other municipalities, would be able to enact better, more effective laws in the area of gun regulation, this claim also lacks merit. In the PFR, Petitioners specifically allege that, "[b]ut for the Firearm Preemption [Statutes], the City of Philadelphia and other municipalities *would* pass their own safety ordinances that *would* prevent or mitigate the harm suffered by

28

their residents, including [Petitioner Citizens]," (PFR ¶91) (emphasis added), namely laws providing for "permit-to-purchase requirements," "one-gun-per-month limits," and "ERPOs." In so averring, Petitioners cite statistical data to support the implementation of their proposed ordinances, assuming that, in contrast to the UFA, these ordinances "*would . . .* protect the lives of their residents." (PFR ¶¶101, 112, 122.) Notably, to support the alleged inadequacy of the UFA, Petitioners depend heavily on remarks made by members of the General Assembly during floor debate—statements that opposed the preemptive reach of Section 6120(a).

But, on an individual and collective scale, all of Petitioners' averments amount to challenges to the democratic nature of the legislative process itself. Notably, Petitioners ignore the fact that Section 6120(a), despite its opposition from certain House and Senate members, is nonetheless a duly enacted law expressing the will, wisdom, and judgment of the General Assembly. Petitioners further fail to realize that, in its status as a valid statute and exercise of legislative authority, Section 6120(a) is generally applicable throughout the Commonwealth; in fact, it dictates, without exception, that it is the sole prerogative of our General Assembly to enact laws in the field of firearm regulation on a statewide basis. Ultimately, "because the act of establishing such policies [] does not pose a direct threat to any one particular individual[,] but affects a broader populace," a generally applicable statute like Section 6120(a), or the UFA in general, is "too remote to establish the necessary causal link between the danger to the victim and the resulting harm." *Gray*, 672 F.3d at 926. Tellingly, the incidents of gun violence listed and described in the PFR were all situations where a private actor committed a private act of violence. As such, the role that the UFA played in overall scenarios is entirely imaginative and speculative, because there are multiple, indeed countless, variables that account for—or contributed

29

toward—the actual incidents of violence in the unique circumstances of each case, including the identity and background of the perpetrator and things such as motive or intent.

Equally important, the United States Court of Appeals for the Sixth Circuit, albeit in an unpublished decision, has persuasively discussed the significance of legislative judgment and choice in policymaking when analyzing a claim predicated on the state-created danger doctrine:

> When the state makes complex governance decisions, even if a plaintiff can show that the state had a "subjective awareness of substantial risk of serious injury," a court must "make some assessment that [the state] did not act in furtherance of a countervailing governmental purpose that justified taking that risk." *Hunt v. Sycamore Community School District Board of Education*, 542 F.3d 529, 541 (6th Cir. 2008). As we have noted, "[i]t is in the very nature of deliberative bodies to choose between and among competing policy options, and yet a substantive due process violation does not arise whenever the government's choice prompts a known risk to come to pass. . . . Many, if not most, governmental policy choices come with risks attached . . . and yet 'it is not a tort for government to govern' by picking one option over another." *Schroder v. City of Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 241 (1974)). As a result, even if a state actor is aware of a substantial risk of harm when it takes action, this court is "unlikely to find deliberate indifference if [the] action was motivated by a countervailing, legitimate governmental purpose." *Hunt*, 542 F.3d at 542.

*Walker v. Detroit Public School District* (6th Cir., No. 12-1367, filed August 26, 2013) (unreported), slip op. at 7.

Importantly, a legislative body's expressed public need for uniformity in an area of legislation, and its decision to invoke and employ the doctrine of preemption to accomplish such uniformity, is one that directly furthers a legitimate governmental

30

interest. *See Ortiz*, 681 A.2d at 154-56; *see also Beneficial National Bank v. Anderson*, 539 U.S. 1, 10-11 (2003); *City and County of Denver v. Qwest Corporation*, 18 P.3d 748, 754-56 (Colo. 2001); *Browne v. United States*, 176 F.3d 25, 26 (2d Cir. 1999); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142-45 (1990); *Albany Area Builders Association v Town of Guilderland*, 546 N.E.2d 920, 922-23 (N.Y. Ct. App. 1989); *United States v. Lee*, 455 U.S. 252, 258-61 (1982); *Dome Realty, Inc. v. City of Paterson*, 416 A.2d 334, 341-42 (N.J. 1980); *cf. CTS Corporation v. Dynamics Corporation of America*, 481 U.S. 69, 88-89 (1987); *Pinney v. Nokia, Inc.*, 402 F.3d 430, 46-61 (4th Cir. 2005); *Norfolk Southern Corp. v. Oberly*, 822 F.2d 388, 399-400 (3d Cir. 1987); *United States v. Merkt*, 794 F.2d 950, 956 (5th Cir. 1986). In essence, and at its core, the desire for "[u]niformity of law encompasses the idea that one person should not suffer a greater burden under the law than another, simply because that person lives in a different [area in a] state." Donald L. Bell, *Comment: The Adequate and Independent State Grounds Doctrine: Federalism, Uniformity, Equality and Individual Liberty*, 16 Florida State University Law Review 365, 383-84 (1988) (footnotes omitted). Therefore, even if the General Assembly was aware that certain geographical areas and/or members of society could potentially be exposed to gun violence on a greater scale, the General Assembly had a legitimate, countervailing government interest in passing Section 6120(a).

In an apparent attempt to escape all this, Petitioner Citizens argue that they belong to an identifiable and discreet class, particularly in terms of race and/or ethnicity and/or the fact that they reside in either the City of Philadelphia or the City of Pittsburgh, the both of which, Petitioners allege, are high crime areas. However, as courts have held, "[a] plaintiff cannot merely . . . name a more particular sub-class of the public as the group to which the government owed a duty, such as one's

31

'neighbors.' Neighbors are still the public." *Jones v. Reynolds*, 438 F.3d 685, 697 (6th Cir. 2006) (citation and internal quotation marks omitted). The same proposition holds true here and applies with equal and compelling force: regardless of the racial and/or ethnic background of each of the Petitioner Citizens, all the Petitioner Citizens are still members of the public, and the UFA does not single them out specially for disparate treatment. Moreover, Petitioners' designation of the cities as high crime areas is insufficient to create a distinct class. As one court explained, "levels of the quality of life in a neighborhood are transient . . . . Private action could easily result in changes in the neighborhood that would create opportunities for private violence that are alleged to exist here; for example, people . . . could move into the neighborhood without the support of the state." *Township of West Orange v. Whitman*, 8 F. Supp. 2d 408, 422-23 (D.N.J. 1998) (internal citation omitted). Significantly, "[t]he 'public in general' rule already internalizes and rejects as insufficient the argument that those living closer to an alleged state-created danger"—*i.e.*, gun violence, "face a higher probability of harm than those living elsewhere." *Hopkins*, 412 F. Supp. 3d at 528. Consequently, an alleged heightened danger posed to residents of cities is still a danger to the public at large—one that is not visited uniquely on the homes, or particular people living, within the cities. *See Township of West Orange*, 8 F. Supp. 2d at 422.

To reiterate, simply "rendering a person more vulnerable to risk does not create a constitutional duty to protect," *Rivera*, 402 F.3d at 37; "[m]ere indifference or inaction in the face of private violence cannot support a substantive due process claim," *Wilson-Trattner*, 863 F.3d at 596; a "passive failure to stop private violence" will not suffice to establish a state-created danger, *Pena*, 432 F.3d at 110; and "[i]t is not enough to allege that a government actor failed to protect an individual from a known danger of bodily harm," *Lombardi*, 485 F.3d at 79. Therefore, for these reasons and those

32

discussed above, we conclude that Petitioners have failed to state a valid claim under the state-created danger doctrine as a matter of law.

## B. Substantive Due Process

Respondents argue that Petitioners' substantive due process claim is not one upon which relief can be granted. Respondents contend that Petitioners do not allege the deprivation of a fundamental right and that the Firearm Preemption Statutes pass rational basis review because they bear a real, substantial relation to a legitimate state interest, namely the regulation of firearms on a statewide basis.

In response, Petitioners maintain that, pursuant to article I, section 1 of the Pennsylvania Constitution, they possess a fundamental right "to enjoy and defend life and property," and the Firearm Preemption Statutes "block [them] from protecting themselves from gun violence with local regulations." (Pet'rs' Br. at 62-63.) Petitioners assert that the Firearm Preemption Statutes are thus subject to heightened scrutiny and, even if they are not, the statutes are not substantially related to an important government interest. According to Petitioners, the Firearm Preemption Statutes do not "improve public safety or reduce gun violence," *id.* at 69, and the Commonwealth does not have a legitimate need for uniformity in the area of gun regulation.

Article I, section 1 of the Pennsylvania Constitution provides: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa. Const. art. I, §1. "This section, like the [D]ue [P]rocess [C]lause in the Fourteenth Amendment of the United States Constitution, guarantees persons in this Commonwealth certain inalienable rights." *Nixon v. Commonwealth*, 839 A.2d

33

277, 286 (Pa. 2003). "While the General Assembly may, under its police power, limit those rights by enacting laws to protect the public health, safety, and welfare, any such laws are subject to judicial review and a constitutional analysis." *Id.* (internal citations omitted).

As an embedded principle of constitutional law, "[i]f [a] statute restricts a fundamental right, it is reviewed under strict scrutiny. If the statute impacts a protected but not fundamental right, then it is subject to rational basis review." *Haveman v. Bureau of Professional and Occupational Affairs, State Board of Cosmetology*, 238 A.3d 567, 573 (Pa. Cmwlth. 2020) (*en banc*) (internal citation omitted). Notably, "[a]s a general matter, economic and social legislation . . . receives rational basis review." *Doe v. Miller*, 886 A.2d 310, 315 (Pa. Cmwlth. 2005).

In conducting rational basis review, this Court "must assess whether the challenged law has 'a real and substantial relation' to the public interests it seeks to advance, and is neither patently oppressive nor unnecessary to these ends." *Shoul v. Department of Transportation, Bureau of Driver Licensing,* 173 A.3d 669, 678 (Pa. 2017). Although the issue of "whether a law is rationally related to a legitimate public policy is a question for the courts, the wisdom of a public policy is one for the legislature." *Id.* Significantly, "in determining the constitutionality of a law, this Court may not question the propriety of the public policies adopted by the General Assembly for the law, but rather is limited to examining the connection between those policies and the law." *Nixon*, 839 A.2d at 286.

Pursuant to the rational basis standard, if there is any reasonably conceivable state of facts or reason that could provide a rational basis for a statute, the challenged statute will be upheld. *See Corteal v. Department of Transportation*, 821 A.2d 173, 177 (Pa. Cmwlth. 2003). Importantly, a legislative body need not articulate

34

its reasoning at the moment a particular decision is made, and a legislative choice may be based on rational speculation unsupported by evidence or empirical data. *See Adams Outdoor Advertising, LP v. Zoning Hearing Board of Smithfield Township*, 909 A.2d 469, 478 (Pa. Cmwlth. 2006); *Corteal*, 821 A.2d at 177. Indeed, "[a]pplication of [the rational basis] standard does not require an express statement of purpose by the General Assembly concerning the statute at issue. . . . [I]f some legitimate reason exists, the provision cannot be struck down, even if its soundness or wisdom might be deemed questionable." *Sadler v. Workers' Compensation Appeal Board (Philadelphia Coca-Cola Company)*, 244 A.3d 1208, 1216 (Pa. 2021) (internal citation and quotation marks omitted).

"During the founding era, [] Americans were no strangers to firearm regulation. Laws regulated the discharge, storage, and aggressive use of firearms, and disarmed people who were considered untrustworthy in some capacity." *Bonidy v. United States Postal Service*, 90 F.3d 1121, 1131 (10th Cir. 2015) (internal citations and quotation marks omitted). "In the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012). At the same time, the U.S. and Pennsylvania Constitutions guarantee an individual a right to keep and bear arms, especially for purposes of self-defense, and this right exists outside the home. *See Caba v. Weaknecht*, 64 A.3d 39, 50-52 (Pa. Cmwlth. 2013); *see also Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017); *Moore v. Madigan*, 702 F.3d 933, 935-40 (7th Cir. 2012).[14] In *Ortiz*, the Cities

---

[14] The Second Amendment of the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be
**(Footnote continued on next page…)**

of Philadelphia and Pittsburgh challenged the propriety of the General Assembly's enactment of Section 6120(a) and whether it could legally preempt their local firearm ordinances. In upholding the validity and authority of the statewide preemption provision in Section 6120(a), our Supreme Court, as noted above, explained that "[b]ecause the ownership of firearms is constitutionally protected, its regulation is a matter of statewide concern . . . . Thus, regulation of firearms is a matter of concern in all of Pennsylvania, not merely in Philadelphia and Pittsburgh, and the General Assembly, not city councils, is the proper forum for the imposition of such regulation." *Ortiz*, 681 A.2d at 156.

In *Johnston*, this Court rejected the landowners' broad, sweeping claim that the "right to protect one's own life" is a fundamental right subject to strict scrutiny and, instead, applied the rational basis test when the landowners claimed that the fundamental right subsumed a right to refuse to connect to a public water supply. 859 A.2d at 10-11. Similarly, here, Petitioners assert a fundamental right to "defend life and property," but they couch this purported right as a right to be free from gun violence and a right to have Petitioner City and other municipalities enact local gun control ordinances. However, our discussion above pertaining to the state-created danger doctrine demonstrates that Petitioners do not possess a general constitutional right to have the government protect them from private acts of violence. Further, it is well settled that Section 6120(a) is a valid exercise of legislative authority, and our General Assembly acted within the confines of the Pennsylvania Constitution, particularly

---

infringed." U.S. Const. amend. II. Additionally, article 1, section 21 of the Pennsylvania Constitution states: "The right of the citizens to bear arms in defence of themselves and the State shall not be questioned." Pa. Const. art. I, §21.

36

article 9, section 2,[15] when it decided to preempt local laws in the area of firearm regulation. *See Ortiz*, 681 A.2d at 154-56. Therefore, we conclude that Petitioners have failed to articulate the deprivation of a fundamental right, and that the Firearm Preemption Statutes must be analyzed under the rubric of the rational basis test.

As explained above, the need for uniformity in certain fields of the law is a legitimate governmental and public interest, and the Firearm Preemption Statutes, coupled with the regulatory regime of the UFA, bears a substantial relation to that interest. In this regard, *Capital Area District Library v. Michigan Open Carry, Inc.*, 826 N.W.2d 736 (Mich. Ct. App. 2012), is instructive. There, the Michigan Court of Appeals reviewed the state's firearm regulation statute, which is structured in a manner that is remarkably comparable to the UFA and contains many similar regulatory provisions in terms of topics and subject matter. In deciding whether the doctrine of field preemption was applicable, the intermediate appeals court initially determined "whether the nature of the regulated subject matter demands exclusive state regulation to achieve the uniformity necessary to serve the state's purpose or interest." *Id.* The court found that "[t]he regulation of firearm possession undoubtedly calls for such exclusive state regulation," noting that if there were a "Balkanized patchwork of inconsistent local regulations," the "citizens of th[e] state would be subject to varying and possibly conflicting regulations regarding firearms and a great deal of uncertainty and confusion would be created." *Id.* (internal citations and quotation marks omitted). The court further noted that, if localities could pass their own firearm laws, "[i]t would be extremely difficult for firearm owners to know where and under what circumstances they could possess a gun." *Id.* Ultimately, the court concluded that "[a]n exclusive,

---

[15] In pertinent part, this provision states that "[a] municipality which has a home rule charter may exercise any power or perform any function not denied . . . by the General Assembly." Pa. Const. art. IX, §2.

37

uniform state regulatory scheme for firearm possession is far more efficient for purposes of obedience and enforcement than a patchwork of local regulation." *Id.* at 746-47.

Akin to the court in *Capital Area District Library*, our own Supreme Court has determined that firearm regulation entails "substantive matters of statewide concern," concluding that "the General Assembly . . . is the proper forum for the imposition of such regulation." *Ortiz*, 681 A.2d at 156. In enacting the Firearm Preemption Statutes, our General Assembly made a policy-based decision to prohibit municipalities from intruding into the arena of firearm regulation and, in so doing, created a uniform system of laws throughout the Commonwealth. As the averments in the PFR illustrate, the General Assembly debated the issue of preemption, and Petitioners' arguments bear more on the wisdom of the legislation rather than on its validity. This Court, as the judicial branch of government, does not act as a super-legislature. In a case decided in 2008, this Court concluded that Section 6120 preempted Petitioner City's ordinances relating to firearm regulation, and we stated: "While we understand the terrible problems gun violence poses for [Petitioner City] and sympathize with its efforts to use its police powers to create a safe environment for its citizens, these practical considerations do not alter the clear preemption imposed by the legislature, nor our Supreme Court's validation of the legislature's power to so act." *Clarke*, 957 A.2d at 365. Although the streams of time have run since then, we reaffirm that statement and sentiment here. There are numerous factors and considerations which must be taken into account by the legislature in establishing the policy it determines provides the most protection for the public, and the courts are not the place to enter into such public debate.

38

It is beyond cavil that, "[w]hen faced with any constitutional challenge to legislation, we proceed to our task by presuming constitutionality in part because there exists a judicial presumption that our sister branches take seriously their constitutional oaths." *Stilp v. Commonwealth*, 905 A.2d 918, 938 (Pa. 2006). Honoring the presumption of constitutionality which attends the Firearm Preemption Statutes, we conclude that the statutes pass muster under the rational basis test and, as such, Petitioners' substantive due process claim lacks merit and is legally insufficient.

## C. Interference with Delegation

Respondents contend that Petitioners' claim for "interference with delegation" fails as a matter of law because Section 6120(a) has clearly deprived Petitioner City from enacting laws in the area of firearm regulation regardless of what other statutory authority it may have to pass legislation for the health and welfare of its citizens and communities in general.

In response, Petitioners argue that the General Assembly is obligated to protect its citizens and delegated to Petitioner City "a portion of its responsibility . . . under the Local Health Administration Law"[16] and "the Disease Prevention and Control Law [of 1955],"[17] particularly the authority to eradicate local "menace[s] to public health." (Pet'rs' Br. at 74-75.) Petitioners assert that Petitioner City "does not have the resources it needs to carry out its duty to address the gun violence epidemic" and, as a result of the Firearm Preemption Statutes, has been "deprive[d] . . . of the ability to fulfill its delegated duty to address gun violence." *Id.* at 75-76.

Initially, we conclude that, based on the plain language of the pertinent statutes, any authority delegated to Petitioner City to "prevent or remove conditions

---

[16] Act of August 24, 1951, P.L. 1304, *as amended*, 16 P.S. §§12001-28.

[17] Act of April 23, 1956, P.L. (1955) 1510, *as amended*, 35 P.S. §§521.1-521.21.

which constitute a menace to public health," Section 10 of the Local Health Administration Law, 16 P.S. §12010, or to "prevent[] and control [] communicable and non-communicable disease," Sections 2 and 3(a) of the Disease Prevention and Control Law, 35 P.S. §§521.2, 521.3(a), does not appear to include (or otherwise correlate into) an authority to enact gun control laws. Generally speaking, "public health" has been defined as "the science and art of preventing disease, prolonging life[,] and promoting health through the organized efforts and informed choices of society, organizations, public and private, communities[,] and individuals."[18] According to a renowned legal dictionary, "public health" is "[t]he healthful or sanitary condition of the general body of people or the community en masse," especially "the methods of maintaining the health of the community, as by preventive medicine and organized care for the sick." Black's Law Dictionary 787 (9th ed. 2009). As "this Court may draw upon common sense and basic human experience to construe terms," *Kohl v. New Sewickley Township Zoning Hearing Board*, 108 A.3d 961, 969 (Pa. Cmwlth. 2015), it is difficult to discern how Petitioners' alleged incidents of gun violence equates into a "public health" matter that gives rise to an express "delegated duty" to implement gun regulation at the local level. This is because gun regulation does not directly affect the health of the people in the medical sense, such as when a communicable disease is introduced into the public, or unsanitary conditions exists in the streets or other infrastructure, or food products contaminated with harmful bacteria enter the marketplace.

Moreover, and more importantly, Petitioner City, like all other home rule municipalities, is prohibited from "exercis[ing] powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are . . .

---

[18] Penka D. Gatseva, *Public health: the Science of Promoting Health*, JOURNAL OF PUBLIC HEALTH 19, 205–206 (2011), available at: https://link.springer.com/article/10.1007/s10389-011-0412-8 (last visited May 24, 2022).

40

[a]pplicable in every part of the Commonwealth." Section 18(b) of the Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. §13133(b); *see* 53 Pa.C.S. §2962. In *Ortiz*, our Supreme Court held that Section 6120(a)'s directive that the General Assembly exclusively govern matters concerning the ownership, possession, transfer, or transportation of firearms evidenced an issue of statewide concern, and, the statute, being equally applicable throughout the Commonwealth, deprived municipalities of authority to regulate these subjects, including Petitioner City. *See* 681 A.2d at 156; *see also Hicks*, 208 A.3d at 926 n.6 (reaffirming and reiterating that Section 6120(a) verifies "the General Assembly's reservation of the *exclusive prerogative* to regulate firearms in this Commonwealth") (emphasis added). In so deciding, the Supreme Court considered and rejected arguments that are substantially similar to those advanced by Petitioner City here. Specifically, in *Ortiz*, the Cities of Philadelphia and Pittsburgh argued that, despite Section 6120(a) of the UFA, the General Assembly could not limit their "ability to perform the basic administrative functions of a municipal government and the ability to fulfill a fundamental purpose for which [a] [c]ity government exists." *Ortiz*, 681 A.2d at 155. The cities further asserted that "the right of a city to maintain the peace on its streets through the regulation of weapons is intrinsic to the existence of the government of that city and, accordingly, an irreducible ingredient of constitutionally protected Home Rule." *Id.* at 155-56. Our Supreme Court disagreed and concluded that, notwithstanding any authority that the General Assembly has bestowed upon the cities to pass legislation, Section 6120(a) preempted the area of firearm regulation and barred the cities from enacting local firearm laws. Naturally, the same result must obtain here, and, following *Ortiz* as binding precedent, we conclude that Petitioners have not pleaded a valid claim for interference with delegation.

Accordingly, viewing the averments in the PFR in the light most favorable to Petitioners, and giving Petitioners the benefit of any doubt, this Court must conclude that counts I, II, and III in the PFR are legally deficient and fail to state claims upon which relief can be granted. As such, we sustain Respondents' preliminary objection in this regard.

## III. Conclusion

For the above-stated reasons, we sustain Respondents' preliminary objections in the nature of a demurrer. To the extent Petitioners claim that municipalities could enact local laws more effective than the Firearm Preemption Statutes, these matters are reserved to the social policy-making branch of our government, the General Assembly. *See, e.g*, *Chester Water Authority v. Pennsylvania Department of Community and Economic Development*, 249 A.3d 1106, 1113-14 (Pa. 2021); *Seebold v. Prison Health Services, Inc.*, 57 A.3d 123, 1245 & n.19 (Pa. 2012).[19] That said, and for the above-stated reasons, we dismiss the PFR with prejudice.

_____
PATRICIA A. McCULLOUGH, Judge


Judge Fizzano Cannon concurs in the result only.

Judges Covey and Wallace did not participate in the decision of this case.

---

[19] The Dissent, in advocating for social reform of gun laws, has not cited any legal authority to support the proposition that Petitioners have pleaded a viable state-created danger claim, a cognizable claim under the substantive component of the Due Process Clause, or a valid claim for "interference with delegation." While there are varying views concerning gun laws, we note that it is the legislature that is charged with enacting laws and social policy, not the courts.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stanley Crawford, Tracey Anderson, :
Delia Chatterfield, Aishah George, :
Rita Gonsalves, Maria Gonsalves- :
Perkins, Wynona Harper, Tamika :
Morales, Cheryl Pedro, Rosalind :
Pichardo, Ceasefire Pennsylvania :
Education Fund, and The City of :
Philadelphia, :
             Petitioners :
                     :   No.  562 M.D. 2020
           v. :
                     :
The Commonwealth of Pennsylvania, :
The Pennsylvania General Assembly, :
Bryan Cutler, in his official capacity as :
Speaker of The Pennsylvania House of :
Representatives, and Jake Corman, in :
his official capacity as President :
Pro Tempore of the Pennsylvania :
Senate, :
             Respondents :

## _**ORDER**_

AND NOW, this 26th day of  May, 2022, the preliminary objections filed by the Commonwealth of Pennsylvania, the Pennsylvania General Assembly, Bryan Cutler, in his official capacity as Speaker of the Pennsylvania House of Representatives, and Jake Corman, in his official capacity as President Pro Tempore of the Pennsylvania State Senate, are hereby SUSTAINED.  The Petition for Review filed by Stanley Crawford, Tracey Anderson, Delia Chatterfield, Aishah George, Rita Gonsalves, Maria Gonsalves-Perkins, Wynona Harper, Tamika Morales,

Cheryl Pedro, Rosalind Pichardo, Ceasefire Pennsylvania Education Fund, and the City of Philadelphia is hereby DISMISSED with PREJUDICE.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stanley Crawford, Tracey Anderson,    :
Delia Chatterfield, Aishah George,    :
Rita Gonsalves, Maria Gonsalves-      :
Perkins, Wynona Harper, Tamika        :
Morales, Cheryl Pedro, Rosalind       :
Pichardo, Ceasefire Pennsylvania      :
Education Fund, and The City of       :
Philadelphia,                         :
                     Petitioners      :
                                      :
              v.                      :    No. 562 M.D. 2020
                                      :    Argued:  June 9, 2021
The Commonwealth of Pennsylvania,     :
The Pennsylvania General Assembly,    :
Bryan Cutler, in his official capacity :
as Speaker of The Pennsylvania        :
House of Representatives, and Jake    :
Corman, in his official capacity as   :
President Pro Tempore of the          :
Pennsylvania Senate,                  :
                     Respondents      :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE ELLEN CEISLER, Judge

CONCURRING OPINION BY
JUDGE COHN JUBELIRER                    FILED: May 26, 2022


Petitioners' allegations regarding the prevalence and severity of gun violence in certain areas of the Commonwealth of Pennsylvania, and the tragic toll such violence has on the lives of those who reside in those areas, are not lost on me. However, I believe that the Court is controlled by precedent, and that our Supreme

Court left little air in its conclusion in *Ortiz v. Commonwealth*, 681 A.2d 152, 156 (Pa. 1996), that the regulation of firearms is to be done at the state, not local, level.

I write separately, as did Senior Judge Leadbetter recently, recognizing "that local conditions may well justify more severe restrictions than are necessary statewide." *City of Philadelphia v. Armstrong*, 271 A.3d 555, 569 (Pa. Cmwlth. 2022) (Leadbetter, S.J., concurring). As she eloquently stated, "[i]t is neither just to impose unnecessarily harsh limits in communities where they are not required nor consistent with simple humanity to deny basic safety regulations to citizens who desperately need them." *Id.* The novel constitutional arguments raised by Petitioners may provide a basis for "our Supreme Court to reconsider the breadth of the *Ortiz* doctrine[] and allow for local restrictions narrowly tailored to local necessities." *Id.* (footnote omitted).

_____

**RENÉE COHN JUBELIRER**, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stanley Crawford, Tracey Anderson, :
Delia Chatterfield, Aishah George, :
Rita Gonsalves, Maria Gonsalves- :
Perkins, Wynona Harper, Tamika :
Morales, Cheryl Pedro, Rosalind :
Pichardo, Ceasefire Pennsylvania :
Education Fund, and The City of :
Philadelphia, :
             Petitioners :
              :
     v. : No. 562 M.D. 2020
              : Argued: June 9, 2021
The Commonwealth of Pennsylvania, :
The Pennsylvania General Assembly, :
Bryan Cutler, in his official capacity :
as Speaker of The Pennsylvania :
House of Representatives, and :
Jake Corman, in his official capacity :
as President Pro Tempore of the :
Pennsylvania Senate, :
             Respondents :

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE ELLEN CEISLER, Judge

DISSENTING OPINION BY
JUDGE CEISLER                     FILED:  May 26, 2022

Because I would overrule each of Respondents' Preliminary Objections to the Petition for Review, except for the objection challenging CeaseFire Pennsylvania Education Fund's (CeaseFire PA) standing, I respectfully dissent.

## I. Introduction

It is no secret that gun violence is on the rise and reaching epidemic levels in urban areas throughout this country, including two major cities in this

Commonwealth: the City of Philadelphia (Philadelphia) and the City of Pittsburgh (Pittsburgh). In their Petition for Review, Petitioners allege myriad facts demonstrating both the prevalence and the severity of gun violence in their communities and the grave toll it has taken on the lives of the individual Petitioners, who are Black and Hispanic residents of high-crime, low-income neighborhoods in Philadelphia and Pittsburgh. Petitioners allege that Philadelphia and Pittsburgh, like many other municipalities in Pennsylvania, have attempted to combat this crisis by adopting local legislation aimed at protecting their residents from gun violence. However, those attempts have been stymied by Respondents' enactment and enforcement of two statutes: Section 6120(a) of the Uniform Firearms Act of 1995, 18 Pa. C.S. § 6120(a) (Section 6120(a)),[1] and Section 2962(g) of the Home Rule Charter and Optional Plans Law, 53 Pa. C.S. § 2962(g) (Section 2962(g))[2] (together, Firearm Preemption Statutes), which preclude Pennsylvania municipalities from enacting virtually all forms of local firearm regulation.[3]

Petitioners aver that Philadelphia, Pittsburgh, and other municipalities throughout Pennsylvania would be better equipped to thwart gun violence in their

---

[1] Section 6120(a) provides: "*No county, municipality or township may in any manner regulate the lawful ownership, possession, transfer or transportation of firearms, ammunition or ammunition components* when carried or transported for purposes not prohibited by the laws of this Commonwealth." 18 Pa. C.S. § 6120(a) (emphasis added).

[2] Section 2962(g) provides: "*A municipality shall not enact any ordinance or take any other action* dealing with the regulation of the transfer, ownership, transportation or possession of firearms." 53 Pa. C.S. § 2962(g) (emphasis added).

[3] Notably, while both Firearm Preemption Statutes preempt local regulation of firearms, they contain key differences. For example, Section 6120(a) applies only to the regulation of "lawful ownership, possession, transfer or transportation" of firearms, while Section 2962(g) is not limited to lawful ownership. Also, Section 2962(g) applies only to "firearms," while Section 6120(a) preempts regulation of "firearms, ammunition or ammunition components."

communities through stricter regulation, were they not prohibited from doing so by the Firearm Preemption Statutes. Petitioners further aver that enforcement of the Firearm Preemption Statutes actually increases the likelihood of gun violence, particularly in communities that are poor and populated by racial minorities.

In *Ortiz v. Commonwealth*, 681 A.2d 152, 156 (Pa. 1996), the Pennsylvania Supreme Court held that the "regulation of firearms is a matter of statewide concern" because the ownership of firearms is constitutionally protected under Article I, Section 21 of the Pennsylvania Constitution.[4] While I agree that the regulation of firearms is a matter of statewide concern, it cannot be disputed that the impacts of gun violence are inevitably local. As Petitioners and the various *Amici Curiae* assert, the Firearm Preemption Statutes more negatively impact urban, populous municipalities than their rural, less populous counterparts.[5] The significant difference in gun violence rates between urban and rural communities in Pennsylvania, as alleged in the Petition for Review, demonstrates precisely why there is a need for local regulation in this area.

Pennsylvania's municipalities have an important duty to protect the health, welfare, and safety of their citizens. In my view, protecting citizens against the threat of gun violence lies at the heart of this duty.

---

[4] "The right of the citizens to bear arms in defence of themselves and the State shall not be questioned." Pa. Const. art. I, § 21.

[5] As the City of Harrisburg (Harrisburg) argues in its *Amicus Curiae* brief: "It is no accident[] . . . that most cases litigated under [Section] 6120[(a)]'s preemption clause arise out of Philadelphia, Pittsburgh, and Harrisburg; plainly, these are municipalities which, year after year, experience the greatest measure of gun violence." Harrisburg's *Amicus Curiae* Br. at 8 (citing cases).

As discussed more fully below, at this stage of the proceedings, I believe Petitioners have pled more than sufficient facts to overcome Respondents' Preliminary Objections, except for the challenge to CeaseFire PA's standing.[6]

## II. Standing

### A. Individual Petitioners

Respondents assert that the individual Petitioners lack standing because their rights to defend themselves and to be free from harm do not surpass the common interests of all citizens. Respondents posit that many other citizens of this Commonwealth are similarly affected by gun violence or have a family member or friend that was a victim of gun violence. Thus, Respondents contend that the individual Petitioners have nothing more than an abstract interest in ensuring that the Firearm Preemption Statutes do not violate the Pennsylvania Constitution. I cannot agree.

Our Supreme Court has articulated the requirements for standing as follows:

> [T]he core concept of standing is that a person who is not adversely affected in any way by the matter he seeks to challenge is not aggrieved thereby and has no standing to obtain a judicial resolution of his challenge.

> An individual can demonstrate that he has been aggrieved if he can establish that he has *a substantial, direct and immediate interest in the outcome of the litigation*. A party has a substantial interest in the outcome of litigation if his interest surpasses that "of all citizens in procuring obedience to the law." "The interest is direct if there is a causal connection between the asserted violation and the harm

---

[6] In its Opinion, the Majority addresses only Respondents' demurrer objections, concluding that they are dispositive of the case. However, because I disagree with that conclusion and with the Majority's dismissal of the Petition for Review, I will address all of Respondents' objections in this Dissenting Opinion. Moreover, because the four Respondents raise a multitude of objections, many of which overlap, I will address their objections collectively by category.

complained of; it is immediate if that causal connection is not remote or speculative."

*Fumo v. City of Phila.*, 972 A.2d 487, 496 (Pa. 2009) (emphasis added) (internal citations omitted); *see also Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 467, 481 (Pa. 2021) (explaining that, to establish standing in a declaratory judgment action, the plaintiff must allege an interest that is direct, substantial, and immediate and must show the existence of an actual controversy).

I believe the individual Petitioners have articulated a substantial interest in the outcome of this matter that surpasses the common interest of all citizens in the Commonwealth. The individual Petitioners are Black and Hispanic residents of Philadelphia and Pittsburgh who have lost loved ones to gun violence and who are themselves at a high risk of death or serious injury due to gun violence in their communities. In the Petition for Review, each individual Petitioner alleges how he or she has been specifically impacted by gun violence in his or her community. *See* Pet. for Rev. ¶¶ 9(a)-18(f). In my view, these Petitioners have clearly alleged "some discernible adverse effect" beyond an "abstract interest" in ensuring that the Firearm Preemption Statutes do not violate the Pennsylvania Constitution. *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 282 (Pa. 1975).

The individual Petitioners have also alleged a "direct and immediate" causal connection between the Firearm Preemption Statutes and their claimed injuries. The individual Petitioners allege that, by enacting and enforcing the Firearm Preemption Statutes, Respondents have prevented Philadelphia and Pittsburgh from adopting local legislation that would protect the individual Petitioners and their families from gun violence. They aver that they are uniquely affected because of the neighborhoods in which they live and their ethnicities and because they have lost loved ones to gun violence and are still suffering emotional trauma due to those

EC - 5

losses and their fear for their own lives. *See* Pet. for Rev. ¶¶ 9(d), 10(e), 11(d), 11(f), 12(e), 12(f), 13(e), 14(b), 15(d), 15(f), 16(d), 17(e), & 18(e).

Accepting the averments in the Petition for Review as true, as we must, I would conclude that the individual Petitioners have established standing to maintain this action. Therefore, I would overrule Respondents' objections to the individual Petitioners' standing.

### B. Philadelphia

Next, Respondents assert that Philadelphia lacks standing to maintain this action. As this Court has explained, a municipality's interest in the outcome of a lawsuit is

> (1) substantial when aspects of the state law have particular application to local government functions (as opposed to general application to all citizens); (2) direct when the state law causes the alleged constitutional harm; and (3) sufficiently immediate when the municipality asserts factually supported interests that are not speculative or remote.

*Robinson Twp. v. Com.*, 52 A.3d 463, 474 (Pa. Cmwlth. 2012), *aff'd in part and rev'd in part on other grounds*, 83 A.3d 901 (Pa. 2013).

I believe Petitioners have alleged sufficient facts to establish Philadelphia's standing to challenge Section 6120(a).[7] As outlined in the Petition for Review, Section 6120(a) restricts Philadelphia's power to enact much-needed local legislation to protect its residents from gun violence. In particular, Petitioners aver:

> 32. Gun violence in Philadelphia is especially troubling. One study found that over a two-year period in Philadelphia (from 2013 to 2014), the overall rate of firearm assault was five times higher for Black residents compared with White residents. Homicide rates in Philadelphia in general are higher than most other major U.S. cities

---

[7] In their brief, Petitioners admit that Section 2962(g) does not apply to Philadelphia. *See* Pet'rs' Br. in Opp'n to Prelim. Objs. at 28 n.14.

(i.e., cities with a population of 250,000 or greater). In 2018, the average homicide rate in these cities was 10.0 per 100,000 people; in Philadelphia that rate was over twice as high: 22.1 per 100,000. Philadelphia now ranks second in the nation, behind just Chicago, in the number of homicides involving guns. Nationally, the homicide rate is 5 per 100,000, meaning Philadelphia's murder rate is nearly 4.4 times higher than the national average. Most of the homicides in Philadelphia are carried out with firearms, specifically handguns. In 2019, 86.8% of all homicides in . . . Philadelphia were a result of gun violence, compared to only 70% nationally.

33. Between 2009 and 2018, the firearm homicide death rate by county in Pennsylvania ranged from 0.8 to 15.0 deaths per 100,000 persons. Philadelphia County had the highest death rate at 15.0 deaths per 100,000 persons, which is nearly 19 times higher than Bucks County, which had the lowest firearm homicide death rate (0.8 deaths per 100,000 persons), and it is more than twice as high as Allegheny County, which had the second-highest firearm homicide death rate of 7.1 deaths per 100,000 persons.

Pet. for Rev. ¶¶ 32-33 (footnotes omitted). In my view, these are staggering figures and unmistakably demonstrate that Philadelphia's interest in this matter is neither speculative nor remote.

Petitioners also aver that, aside from the loss of hundreds of Philadelphians' lives each year, gun violence imposes a significant economic burden on the city's financial resources. *See, e.g.*, *id.* ¶ 51 ("A firearm homicide [in Philadelphia] is associated with an estimated average cost of $1.42 million due to medical expenses, lost earnings/productivity, property damage, and criminal justice costs. On average, a non-fatal firearm-related injury costs $46,632 in medical expenses and lost productivity.") (footnotes omitted).

Petitioners further allege that the Firearm Preemption Statutes impermissibly interfere with Philadelphia's duty to protect the health, safety, and welfare of its residents. *See Ryan v. City of Phila.*, 465 A.2d 1092, 1093 (Pa. Cmwlth. 1983)

(recognizing that chief among local municipalities' responsibilities is their obligation to "protect [their] citizens' health, safety, and welfare"). Petitioners aver:

> 55. [Section 6120(a)] endangers the lives of the [individual] Petitioners and others in their communities by effectively preventing local municipalities from fulfilling their core duties to protect the health and safety of their residents. Moreover, since passing this law in 1974, the General Assembly has continued to amend Section 6120[(a)], and with each amendment, the General Assembly has further restricted the ability of municipalities like Philadelphia to address gun violence. At the same time, the General Assembly has repeatedly blocked any attempt to loosen preemption restrictions, while steadfastly refusing to act to curb gun violence at the state level. This combination is a dangerous one, and by its actions, the General Assembly has exposed the [i]ndividual Petitioners to direct risk of gun violence.
>
> 56. The General Assembly's passage of Section 6120[(a)] and amendments thereto, coupled with its refusal to pass evidence-based gun safety legislation on the state level, operate to actively prevent an effective gun safety approach that would save the lives, property, and bodily integrity of Pennsylvania residents, particularly in low-income neighborhoods in [Philadelphia and Pittsburgh].

Pet. for Rev. ¶¶ 55-56.

In *Franklin Township v. Department of Environmental Resources*, 452 A.2d 718, 721-23 (Pa. 1982), our Supreme Court held that a local municipality had standing to challenge the Department of Environmental Resources' permit for a landfill, in light of the "responsibilit[y] of local government" to "protect[] and enhance[] . . . the quality of life of its citizens." I believe that protecting residents from gun violence is equally, if not more, essential to the protection and enhancement of Philadelphia residents' quality of life. *See City of Phila. v. Com.*, 838 A.2d 566, 579 (Pa. 2003) (holding that Philadelphia had standing to challenge

the effects of allegedly unconstitutional legislation because the legislation interfered with Philadelphia's interests and functions as a governing entity).

I would conclude that Philadelphia has sufficiently averred an interest in this litigation that is neither speculative nor remote. Therefore, I would overrule Respondents' objections to Philadelphia's standing.

### C. CeaseFire PA

With regard to the standing of an association, such as CeaseFire PA, our Court has explained:

> An association has standing to bring an action on behalf of its members where *at least one of its members is suffering an immediate or threatened injury as a result of the challenged action*. . . . This rule applies equally to nonprofit membership corporations. . . .
>
> To have standing on this basis, the plaintiff organization must allege *sufficient facts to show that at least one of its members has a substantial, direct and immediate interest. . . . Where the organization has not shown that any of its members have standing, the fact that the challenged action implicates the organization's mission or purpose is not sufficient to establish standing*.

*Ams. for Fair Treatment, Inc. v. Phila. Fed'n of Teachers*, 150 A.3d 528, 533-34 (Pa. Cmwlth. 2016) (emphasis added); *see Papenfuse*, 261 A.3d at 473-74.

Here, the Petition for Review does not identify a single member of CeaseFire PA who is aggrieved by this matter. That omission alone precludes CeaseFire PA from establishing associational standing on behalf of its members.

Furthermore, to the extent Petitioners claim that CeaseFire PA has standing based on its mission of advocating for gun control measures, *see* Pet. for Rev. ¶¶ 41-48, an *en banc* panel of this Court recently rejected a similar claim. In *Allegheny Reproductive Health Center v. Pennsylvania Department of Human Services*, 249

A.3d 598, 606 n.11 (Pa. Cmwlth. 2021) (*en banc*), we stated that "[a]n organization does not have standing by virtue of its purpose." This Court further explained: "'Where the organization has not shown that any of its members have standing [individually], *the fact that the challenged action implicates the organization's mission or purpose is not sufficient to establish standing*.'" *Id.* (quoting *Ams. for Fair Treatment*, 150 A.3d at 534) (emphasis added). Here, CeaseFire PA has not demonstrated that any of its members have standing individually; thus, the fact that the Firearm Preemption Statutes may implicate CeaseFire PA's mission or purpose is insufficient to confer standing under our Court's precedent.[8]

Therefore, I would sustain Respondents' objections challenging CeaseFire PA's standing.

### III. Non-Justiciable Political Questions

Next, Respondents assert that Petitioners' claims constitute non-justiciable political questions that are outside the purview of judicial consideration. Our Supreme Court has described the political question doctrine as follows:

---

[8] Citing federal cases, Petitioners also argue that an organization may establish standing in its own right if it has suffered a concrete injury *to itself* as a result of the complained-of conduct. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982) ("Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback in the organization's abstract social interests."); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 308 (3d Cir. 2014) (recognizing that to establish an injury to itself, an organization "must show that its activities or operations were sufficiently disrupted by the disputed conduct"). Petitioners admit, however, that this Court is not bound by federal case law analyzing standing under Article III of the United States Constitution. *See* Pet'rs' Br. in Opp'n to Prelim. Objs. at 25 n.13.

In any event, even applying that analysis, I would conclude that CeaseFire PA has not established standing in its own right. CeaseFire PA avers that the Firearm Preemption Statutes have forced it to divert its efforts and resources away from advocacy and public education in order to challenge the preemption of local gun control ordinances. *See* Pet. for Rev. ¶¶ 47-48. These generalized allegations do not establish a concrete, discernable injury to the organization's finances or operations as required to establish standing in its own right.

EC - 10

The applicable standards to determine whether a claim warrants the exercise of judicial abstention or restraint under the political question doctrine are well[-]settled. Courts will refrain from resolving a dispute and reviewing the actions of another branch *only where "the determination whether the action taken is within the power granted by the Constitution has been entrusted exclusively and finally to the political branches of government for 'self-monitoring.'"*

*William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 170 A.3d 414, 437 (Pa. 2017) (alteration in original) (citation omitted) (emphasis added). However, courts "'will not refrain from resolving a dispute [that] involves *only an interpretation of the laws of the Commonwealth*, for the resolution of such disputes is our constitutional duty.'" *Id.* at 438 (emphasis added) (citation omitted). Moreover, "'[t]he need for courts to fulfill their role of enforcing constitutional limitations is *particularly acute where the interests or entitlements of individual citizens are at stake*.'" *Id.* (emphasis added) (citation omitted).

Applying these considerations to the averments in the Petition for Review, I would conclude that Petitioners' claims are not barred by the political question doctrine. Here, Petitioners allege that the Firearm Preemption Statutes: (1) unconstitutionally infringe on their indefeasible rights to life and liberty under Article I, Section 1 of the Pennsylvania Constitution; and (2) impermissibly interfere with Philadelphia's public health-related duties statutorily delegated by the Commonwealth. Resolution of these claims will require this Court to conduct statutory interpretation and to articulate the limitations, if any, on the Commonwealth's constitutional powers with respect to gun control legislation. These are not non-justiciable political questions, but lie squarely within our Court's authority. *See Council 13, Am. Fed'n of State Cnty. & Mun. Emps. v. Com.*, 986 A.2d 63, 75 (Pa. 2009) (recognizing that the judicial branch has the power and

authority "'to determine whether the Constitution or laws of the Commonwealth require or prohibit the performance of certain acts'") (citation omitted).

It is true, as Respondents point out, that matters of public policy are reserved exclusively for the legislature and that the General Assembly has the discretion to decide, as a matter of public policy, whether to enact, amend, or repeal a particular statute. While Petitioners make several policy arguments in support of their claims, the crux of Petitioners' allegations is that the Firearm Preemption Statutes impinge on the exercise of their fundamental rights under Article I, Section 1 of the Pennsylvania Constitution, which weighs in favor of justiciability and against the finding of a political question. *See Gondelman v. Com.*, 554 A.2d 896, 899 (Pa. 1989) ("Any concern for a functional separation of powers is, of course, overshadowed *if the classification impinges upon the exercise of a fundamental right*[] . . . .") (emphasis added); *Sweeney v. Tucker*, 375 A.2d 698, 709 (Pa. 1977) ("[T]he political question doctrine is *disfavored when a claim is made that individual liberties have been infringed*.") (emphasis added). Indeed, our Supreme Court has stated: "Where civil liberties are concerned, '[o]ne does not think of [the legislature] as functionally equipped or designed to interpret the Constitution without review, nor under our system, does one wish to leave to [the legislature] the unbridled authority to determine the constitutionality of its own acts.'" *Sweeney*, 375 A.2d at 709-10 (alterations in original) (citation omitted).

Therefore, I would overrule Respondents' objections based on non-justiciable political questions.

## IV. Ripeness

Respondents also assert that Petitioners' claims are not ripe for disposition. Respondents assert that, in support of their claims for relief, Petitioners

impermissibly refer to ordinances that have not yet been passed but may be passed at some unspecified time in the future, should the Firearm Preemption Statutes be deemed unconstitutional. Therefore, Respondents contend that there is no actual controversy. However, I believe this contention is belied by the allegations in the Petition for Review.

Generally, the doctrine of ripeness requires "the presence of an actual controversy." *Bayada Nurses, Inc. v. Dep't of Lab. & Indus.*, 8 A.3d 866, 874 (Pa. 2010). "When determining whether a matter is ripe for judicial review, courts generally consider whether the issues are adequately developed and the hardships that the parties will suffer if review is delayed." *Id.*

Because the Petition for Review seeks declaratory relief, this case is governed by the Declaratory Judgments Act, 42 Pa. C.S. §§ 7531-41. As this Court has explained:

> [T]he Declaratory Judgments Act[] . . . provides a *relatively lenient standard for ripeness in declaratory judgment actions*. The Declaratory Judgments Act is remedial in nature. 42 Pa. C.S. § 7541(a). *"Its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and is to be liberally construed and administered."* *Id.* An action is ripe for adjudication under the Declaratory Judgments Act *where it presents "the ripening seeds of a controversy."* *Wecht v. Roddey*, 815 A.2d 1146, 1150 (Pa. Cmwlth. 2002).

*Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1217-18 (Pa. Cmwlth. 2018) (*en banc*) (emphasis added).

I believe Petitioners have sufficiently alleged that the Firearm Preemption Statutes have precluded, and continue to preclude, Philadelphia and Pittsburgh from passing much-needed gun control legislation to protect their residents. In their Petition for Review, Petitioners identify numerous examples of past ordinances –

including permit-to-purchase laws, one-gun-per-month limits, and extreme risk protection orders – that have been struck down because of the Firearm Preemption Statutes. *See* Pet. for Rev. ¶¶ 57-60, 92, 99, 110-11, & 124; *see also id.* ¶ 88 (averring that the General Assembly has blocked 17 previous attempts to narrow or repeal the Firearm Preemption Statutes). Petitioners aver that these types of ordinances, tailored to the specific needs of the communities they are intended to protect, would have significantly reduced gun violence if not for the Firearm Preemption Statutes. Simply because these ordinances are no longer in effect, or were never passed, due to preemption does not render this controversy unripe.

Respondents compare Petitioners' challenge to the Firearm Preemption Statutes with several cases challenging proposed or unenforced legislation. *See, e.g.*, President *Pro Tempore*'s Br. in Support of Prelim. Objs. at 27-29. I believe Respondents' reliance on these cases is misplaced, however, because Petitioners here do not challenge proposed legislation or unenforced ordinances. Rather, Petitioners challenge the Firearm Preemption Statutes, which are currently in effect and have been applied, and continue to be applied, to their detriment. *Cf. Phantom Fireworks*, 198 A.3d at 1218 (distinguishing a challenge to "a zoning ordinance that had not been enforced or applied" with a challenge to "a taxing statute" that is presently "in force").

In my view, Petitioners have shown a demonstrable pattern of Pennsylvania municipalities passing gun control legislation, only to have that legislation subsequently preempted. I do not believe that Philadelphia, or any other municipality, is required to pass new gun control ordinances in order to render this controversy ripe, particularly in light of the lenient ripeness standard applicable in declaratory judgment actions.

Therefore, because I would conclude that "the ripening seeds of a controversy" are clearly present here, I would overrule Respondents' objections based on ripeness.

## V. Res Judicata and Collateral Estoppel

Respondents assert that Philadelphia's causes of action are barred by the doctrines of res judicata and collateral estoppel. Our Court has explained these principles as follows:

> Res judicata encompasses two related, yet distinct principles: technical res judicata and collateral estoppel. Technical res judicata provides that where a final judgment on the merits exists, a future lawsuit on the same cause of action is precluded. Collateral estoppel acts to foreclose litigation in a subsequent action where issues of law or fact were actually litigated and necessary to a previous final judgment.
>
> Technical res judicata requires the coalescence of four factors: (1) identity of the thing sued upon or for; (2) *identity of the causes of action*; (3) identity of the persons or parties to the action; and (4) identity of the quality or capacity of the parties suing or being sued. *Res judicata applies to claims that were actually litigated as well as those matters that should have been litigated. Generally, causes of action are identical when the subject matter and the ultimate issues are the same in both the old and new proceedings*.
>
> Similarly, collateral estoppel bars a subsequent lawsuit where (1) *an issue decided in a prior action is identical to one presented in a later action*, (2) the prior action resulted in a final judgment on the merits, (3) the party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action, and (4), the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action.

*J.S. v. Bethlehem Area Sch. Dist.*, 794 A.2d 936, 939 (Pa. Cmwlth. 2002) (internal citations omitted) (emphasis added).

In arguing that Philadelphia's action is barred by res judicata and collateral estoppel, Respondents rely on three cases: *Ortiz*; *Clarke v. House of Representatives*, 957 A.2d 361 (Pa. Cmwlth. 2008), *aff'd*, 980 A.2d 34 (Pa. 2009); and *Schneck v. City of Philadelphia*, 383 A.2d 227 (Pa. Cmwlth. 1978).

*Ortiz* was a declaratory judgment action in which members of Philadelphia's City Council and others sued the Governor, the Pennsylvania Attorney General, and Philadelphia's District Attorney. The *Ortiz* petitioners sought to enjoin Section 6120(a)'s preemption of local assault weapons regulations enacted by Philadelphia and Pittsburgh, as well as a declaration that Section 6120(a) violated both cities' home rule power to enact local legislation. *Clarke* was a declaratory judgment action in which members of Philadelphia's City Council sought a declaration that several of Philadelphia's then-existing gun control ordinances were not preempted by Section 6120(a). *Schneck* was a class action suit against Philadelphia in which individual gun purchasers sought to enjoin enforcement of a Philadelphia firearm ordinance on preemption grounds.

None of these cases, however, involved an Article I, Section 1 constitutional challenge, nor did they challenge the Firearm Preemption Statutes' interference with Philadelphia's ability to fulfill its delegated duties under the Local Health Administration Law (LHAL), Act of August 24, 1951, P.L. 1304, *as amended*, 16 P.S. §§ 12001-12028, or the Disease Prevention and Control Law of 1955 (DPCL), Act of April 23, 1956, P.L. (1955) 1510, *as amended*, 35 P.S. §§ 521.1-521.21. As such, the causes of action in this case differ significantly from the causes of action in *Ortiz*, *Clarke*, and *Schneck*.

Respondents' collateral estoppel objection fails for the same reason. Collateral estoppel bars a subsequent lawsuit only where a legal issue decided in the

prior action is identical to one presented in the later action. *J.S.*, 794 A.2d at 939. As explained above, the Courts in *Ortiz*, *Clarke*, and *Schneck* did not consider or decide whether the Firearm Preemption Statutes violate individual citizens' rights under Article I, Section 1 of the Pennsylvania Constitution or whether they interfere with Philadelphia's delegated duties under the LHAL or the DPCL.

Therefore, because this case involves different causes of action and different legal issues than the prior cases, I would overrule Respondents' objections based on res judicata and collateral estoppel.

## VI. Scandalous or Impertinent Matter

President *Pro Tempore* of the Pennsylvania Senate Jake Corman (President *Pro Tempore*) objects to numerous paragraphs in the Petition for Review on the basis that they contain scandalous or impertinent averments. In particular, he contends that the challenged averments "cast a derogatory light on the General Assembly or the Commonwealth," "pertain to statements and information regarding gun violence that certain legislators presented to the General Assembly as it was considering whether to enact or amend the [Firearm] Preemption [Statutes]," "concern how [the i]ndividual Petitioners or other citizens were impacted by gun violence," and "are focused on irrelevant background information or are purely speculative." President *Pro Tempore*'s Br. in Support of Prelim. Objs. at 48-49.

Under our Rules of Civil Procedure, preliminary objections may be filed for "failure of a pleading to conform to law or rule of court or inclusion of scandalous or impertinent matter." Pa.R.Civ.P. 1028(a)(2). To be scandalous and impertinent, "the allegations must be immaterial and inappropriate to the proof of the cause of action." *Common Cause/Pa. v. Com.*, 710 A.2d 108, 115 (Pa. Cmwlth. 1998) (*en banc*), *aff'd*, 757 A.2d 367 (Pa. 2000). However, "the right of a court to strike

impertinent matter should be *sparingly exercised* and *only when* [*the objecting*] *party can affirmatively show prejudice.*" *Dep't of Env't Res. v. Hartford Accident & Indem. Co.*, 396 A.2d 885, 888 (Pa. Cmwlth. 1979) (emphasis added).

Here, President *Pro Tempore* offers a lengthy list of allegedly offending paragraphs in the Petition for Review and categorizes them by the general manner in which he believes they run afoul of Pa.R.Civ.P. 1028(a)(2). *See* President *Pro Tempore*'s Br. in Support of Prelim. Objs. at 47-51. However, President *Pro Tempore* does not identify the specific language in each paragraph to which he takes offense, nor does he explain how he has been prejudiced by any of the challenged averments. Instead, he baldly asserts that the averments are "wholly irrelevant to Petitioners' causes of action and in some respects scandalous[] too." *Id.* at 51. I would conclude that this unsupported declaration is insufficient to justify striking the averments.

Therefore, I would overrule President *Pro Tempore*'s objections based on scandalous or impertinent averments.

## VII. Demurrer

I will now turn to the three demurrer Preliminary Objections that form the basis of the Majority's Opinion.

### A. State-Created Danger

First, I disagree with the Majority's conclusion that Petitioners have failed to plead a legally sufficient state-created danger claim. To state a claim of state-created danger, a petitioner must satisfy four requirements:

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

EC - 18

(3) a relationship between the state and the [petitioner] existed such that the [petitioner] was a foreseeable victim of the [respondent's] acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (internal quotation marks and footnotes omitted).

In concluding that Petitioners have failed to state a viable state-created danger claim, the Majority relies on *Johnston v. Township of Plumcreek,* 859 A.2d 7 (Pa. Cmwlth. 2004). In *Johnston*, residents of several townships challenged local ordinances requiring them to connect their homes to the public water system, which they claimed were unconstitutional due to the threat of terrorist attacks upon the public water supply. The *Johnston* Court considered the state-created danger doctrine in the context of the residents' substantive due process claims made under 42 U.S.C. § 1983, relating to violations of civil rights, and Article I, Section 1 of the Pennsylvania Constitution, ultimately concluding that the doctrine was not applicable to either claim. This Court held:

> First, the state-created danger [doctrine] has been used to make states liable in damages where the state, by affirmative exercise of its power, has rendered an individual unable to care for himself. The leading case in this area of law is *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189[] . . . (1989), in which the [United States] Supreme Court held that a county agency could not be held liable in damages where a child suffered abuse while in his father's custody. The Court reasoned that the Due Process Clause does not guarantee minimal safety for citizens but, rather, protects citizens from overreaching by the state. *DeShaney* placed limits upon what is known

as the "state-created danger" theory for creating Section 1983 civil rights liability in damages to the situation where the state has limited the liberty of the citizen to act in his own behalf. However, as far as can be determined, the "stated-created danger" body of jurisprudence has never been used to nullify a statute or ordinance.

Second, even if the "state-created danger" theory could be used to render a statute unconstitutional, it does not fit the facts of this complaint. In *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998), the [United States] Court of Appeals [for the Sixth Circuit] held that the state could not be held liable for a "risk that affects the public at large." The state has to be aware that its actions specifically endanger an individual in order to be held liable. . . . All government activities involve some risk; for example, motorists are killed each year on state highways. The mere construction of a highway, however, does not give rise to civil rights liability to each of those accident victims in part because the risk is general and not specific to an individual. Here, the trial court correctly observed that the harm alleged by Residents was conjectural, not imminent and real.

The [o]rdinances do not violate [the r]esidents' substantive due process rights under the state-created danger theory. Under *DeShaney*, the [t]ownships do not have an obligation to guarantee that terrorists, who are private actors whether homegrown or international, will not contaminate the [w]ater [a]uthority's system. Further, there are no allegations in the complaint that [the r]esidents, as opposed to any and all citizens of this country, are in imminent danger and at special risk. Most importantly, the state-created danger theory is a construct by which damages are awarded for constitutional torts. It is not used to nullify statutory law, and we will not do so here.

*Johnston*, 859 A.2d at 12-14 (footnotes omitted).

Significantly, in reaching this decision, the *Johnston* Court emphasized that "if the 'state-created danger' theory could be used to render a statute unconstitutional, it [did] not fit the facts of th[at] complaint" because "the harm alleged by [the r]esidents was *conjectural, not imminent and real*," and because "there [were] *no allegations* in the complaint that [the r]esidents, as opposed to any

and all citizens of this country, [were] in imminent danger and at special risk." *Id.* at 13-14 (emphasis added). It was on this basis that our Court concluded that the residents could not establish a state-created danger claim.

I believe *Johnston* is factually distinguishable from this case in a critical respect. The alleged harm in *Johnston* was purely conjectural. The residents in *Johnston* "asserted that as a result of the terrorist attacks on September 11, 2001, and the nation's war on terrorism, there is now a real and present danger of terrorist attacks on public water systems." *Id.* at 9. However, as this Court noted, "[t]here [were] *no allegations*, for example, that the [w]ater [a]uthority, the [t]ownships or Armstrong County *ha*[*d*] *been identified as special targets for terrorists*." *Id.* at 13 n.15 (emphasis added). Here, however, the individual Petitioners *have* articulated precisely how the Firearm Preemption Statutes have placed them at "special risk" compared to the general public due to their ethnicities, the cities in which they live, and the recent shooting deaths of their loved ones. These allegations are not based on conjecture, but on very real facts. *See* Pet. for Rev. ¶¶ 9(a)-18(f). Contrary to the Majority, I do not believe our Court's pronouncement in *Johnston* – that "as far as can be determined," the state-created-danger doctrine "has never been used to nullify a statute or ordinance" – should be read as blanketly prohibiting all state-created-danger challenges to state laws, because our ruling in that case was clearly limited to its facts. *See Johnston*, 859 A.2d at 13-14.[9]

I would conclude that Petitioners have stated a legally sufficient state-created danger claim. Therefore, I would overrule this objection.

---

[9] As Petitioners correctly point out, no Pennsylvania appellate court has cited or relied on *Johnston* for its state-created danger analysis since the decision was issued in 2004.

**B. Substantive Due Process**

Petitioners allege that the Firearm Preemption Statutes violate their substantive due process rights to enjoy and defend life and liberty under Article I, Section 1 of the Pennsylvania Constitution. Our Supreme Court has explained:

> Substantive due process is the "esoteric concept interwoven within our judicial framework to guarantee fundamental fairness and substantial justice," and its precepts *protect fundamental liberty interests against infringement by the government. . . .*
>
> [F]or substantive due process rights to attach *there must first be the deprivation of a property right or other interest that is constitutionally protected.*

*Khan v. State Bd. of Auctioneer Exam'rs*, 842 A.2d 936, 946 (Pa. 2004) (emphasis added) (footnote and internal citation omitted). In particular, Petitioners assert that the Article I, Section 1 protections include the right to "enjoy[] and defend[] life and liberty" and that the Firearm Preemption Statutes prevent Petitioners from protecting themselves from gun violence.

The Majority applies the rational basis test to Petitioners' substantive due process challenge and concludes that the Firearm Preemption Statutes bear a substantial relationship to a legitimate state interest – namely, the statewide regulation of firearms. Even assuming that the rational basis test is the correct standard to be applied here, I would conclude that Petitioners have stated a legally sufficient substantive due process claim.

The General Assembly's power to preempt local legislation is not absolute, and our Supreme Court has previously struck down preemption statutes that violate Article I of the Pennsylvania Constitution. *See, e.g.*, *Robinson Twp. v. Com.*, 83

A.3d 901, 946 (Pa. 2013).[10] That is because preemption statutes, like other laws, are "subject to restrictions enumerated in the [Pennsylvania] Constitution and to limitations inherent in the form of government chosen by the people of this Commonwealth," including "the express exception of certain fundamental rights reserved to the people in Article I of our Constitution." *League of Women Voters v. Com.*, 178 A.3d 737, 803 (Pa. 2018).

Citing *Ortiz*, the Majority concludes that the Firearm Preemption Statutes further the Commonwealth's legitimate interest in regulating citizens' possession and ownership of firearms on a statewide basis. In *Ortiz*, the Supreme Court was faced with a constitutional challenge involving the right to bear arms under Article I, Section 21 of the Pennsylvania Constitution. The *Ortiz* Court concluded:

> *Because the ownership of firearms is constitutionally protected, its regulation is a matter of statewide concern.* The [Pennsylvania C]onstitution does not provide that the right to bear arms shall not be questioned in any part of the [C]ommonwealth except Philadelphia and Pittsburgh, where it may be abridged at will, but that it shall not be questioned in any part of the [C]ommonwealth. Thus, *regulation of firearms is a matter of concern in all of Pennsylvania, not merely in Philadelphia and Pittsburgh, and the General Assembly, not city councils, is the proper forum for the imposition of such regulation.*

681 A.2d at 156 (emphasis added); *accord Clarke*, 957 A.2d at 364 (invalidating local ordinances that "regulate[d] firearms – an area that both Section 6120[(a)] and [*Ortiz*] have made clear is an area of statewide concern over which the General Assembly has assumed sole regulatory power").

---

[10] Notably, the Supreme Court's plurality decision in *Robinson Township* did not endorse or reject our Court's Article I, Section 1 substantive due process analysis and deemed the environmental statute at issue unconstitutional on other grounds. Justice Baer, in his Concurring Opinion, specifically stated that he agreed with our Court's substantive due process analysis and believed it was the proper basis for ruling that the challenged statute was unconstitutional. *See Robinson Twp.*, 83 A.3d at 1001-08 (Baer, J., concurring).

Critically, however, *Ortiz* did not involve a substantive due process challenge under Article I, Section 1 of the Pennsylvania Constitution, as is alleged in this case. In light of *Ortiz*'s holding that the "regulation of firearms is a matter of concern in all of Pennsylvania," this Court is being asked to balance the constitutional right of Petitioners to defend their lives and liberty under Article I, Section 1 and the constitutional right of all Pennsylvania citizens to bear arms under Article I, Section 21. That question was not before the Supreme Court in *Ortiz*. Therefore, I do not believe *Ortiz* bars the present substantive due process challenge to the Firearm Preemption Statutes.

Furthermore, 26 years have passed since *Ortiz* was decided. The United States of 1996 is very different from the United States of 2022. As painstakingly described in the Petition for Review, gun violence in our country and in our Commonwealth has reached epidemic levels and is wreaking havoc on the lives of the individual Petitioners and their families. Perhaps it is time for our Supreme Court to revisit *Ortiz* in light of these circumstances.

At this stage of the proceedings, this Court need only consider whether the Petition for Review adequately alleges a substantive due process claim under Article I, Section 1 of the Pennsylvania Constitution. I believe that it does. Therefore, I would overrule this objection.

## C. Interference with Delegation

Lastly, I disagree with the Majority's conclusion that Philadelphia (the only Petitioner to assert this claim) has failed to state a viable claim of interference with delegated duties. In the Petition for Review, Philadelphia avers that Section 6120(a) impermissibly interferes with the public health-related duties that the Commonwealth expressly delegated to it under both the LHAL and the DPCL.

Section 10(c) of the LHAL provides in pertinent part: "After it has been established, the county department of health . . . shall *prevent or remove conditions which constitute a menace to public health*." 16 P.S. § 12010(c). In this case, Philadelphia has specifically alleged that gun violence is a menace to the public health of its residents. Pet. for Rev. ¶¶ 32-35, & 148. It has also offered specific examples of how gun violence poses a health risk to the individual Petitioners who reside in high-crime, low-income neighborhoods in Philadelphia. *See id.* ¶¶ 9-18. Philadelphia avers that without localized gun control measures, it is unable to protect its residents from the high rate of firearm homicides, *id.* ¶ 32, the mental health crisis manifest in increasing firearm suicides occurring in Philadelphia, *id.* ¶ 36, and the physical and mental health crises experienced by residents of high-crime neighborhoods due to their fears of gun violence, *id.* ¶¶ 9-18.

Section 3(a) of the DPCL states:

> Local boards and departments of health shall be primarily responsible for *the prevention and control of communicable and non-communicable disease*, including disease control in public and private schools, in accordance with the regulations of the board and subject to the supervision and guidance of the [Pennsylvania D]epartment [of Health].

35 P.S. § 521.3(a) (emphasis added).[11] Under this provision, the Commonwealth has delegated to Philadelphia the primary responsibility of preventing and controlling "non-communicable disease" and the authority to address conditions within its borders that contribute to the spread of non-communicable disease. In this case, Philadelphia avers that gun violence contributes to the spread of disease in

---

[11] Section 2(f) of the DPCL defines "local board or department of health" as "[t]he board of health or the [d]epartment of public health of a city, borough, incorporated town or township of the first class, or a county department of health, or joint county department of health." 35 P.S. § 521.2(f).

Philadelphia by filling hospital beds with individuals injured by gun violence, inflicting severe mental trauma on the victims of gun violence, and imposing other public health-related ills on the city's institutions. *See* Pet. for Rev. ¶¶ 13(e), 34, 36, 40, 49, 51, & 52; *cf. Pa. Rest. & Lodging Ass'n v. City of Pittsburgh*, 211 A.3d 810, 828-29, & nn.17-18 (Pa. 2019) (concluding that a city ordinance requiring paid sick leave "relat[es] to disease prevention and control" by preventing sick individuals from showing up to work).

Respondents contend that neither the LHAL nor the DPCL grants Philadelphia the authority to enact legislation in areas expressly preempted by the General Assembly. Philadelphia, however, does not argue that the statutes grant such authority; rather, Philadelphia argues that it has been given the *responsibility*, but *not the authority*, to pass local regulations to address the public health crisis caused by gun violence. Philadelphia avers that, in this way, Respondents have interfered with its statutorily delegated duties.

Our Supreme Court has recognized that the Commonwealth has a fundamental duty to "maintain order and to preserve the safety and welfare of all citizens." *Cnty. of Allegheny v. Com.*, 490 A.2d 402, 410-11 (Pa. 1985). Pursuant to the LHAL and the DPCL, the Commonwealth expressly delegated a portion of this duty to Philadelphia, by charging county health departments with the "protection and promotion of the health of the people," Section 2(a) of the DPCL, 16 P.S. § 12002(a), the prevention or removal of "conditions which constitute a menace to public health," Section 10 of the DPCL, 16 P.S. § 12010, and the prevention and control of the spread of "non-communicable disease," Section 3(a) of the LHAL, 35 P.S. § 521.3(a). Petitioners aver that by continuing to enforce and expand the Firearm Preemption Statutes, Respondents have deprived Philadelphia of its ability

to carry out these duties, because it cannot enact life-saving ordinances that would protect its residents from gun violence. *See Pa. Rest.*, 211 A.3d at 828 (explaining that the DPCL is "a holistic scheme that, for purposes of disease prevention and control, favors local regulation . . . over state-level regulation, and correspondingly *allows local lawmakers to impose more stringent regulations than state law provides*") (emphasis added); Section 16 of the DPCL, 35 P.S. § 521.16 (allowing municipalities to "enact ordinances or issue rules and regulations relating to disease prevention and control, which are not less strict than the provisions of this act or the rules and regulations issued thereunder by the [State Advisory Health B]oard").

In rejecting Petitioners' interference with delegation claim, the Majority relies exclusively on *Ortiz* and concludes that its holding necessarily forecloses Petitioners' claim. I cannot agree. As discussed above, *Ortiz* involved Philadelphia's authority to enact gun control legislation pursuant to its home rule charter. The petitioners in *Ortiz* did not raise an interference with delegation claim, nor was the Supreme Court asked to consider the impact of Section 6120(a) on Philadelphia's statutorily delegated duties under either the LHAL or the DPCL.

I would conclude that the Petition for Review states a legally sufficient claim that Respondents have impermissibly interfered with Philadelphia's statutorily delegated duties under the LHAL and the DPCL. Therefore, I would overrule this objection.

## VIII. Conclusion

It is well settled that "[i]n order to sustain preliminary objections, *it must appear with certainty that the law will not permit recovery*, and any doubt should be resolved by a refusal to sustain them." *Pa. Virtual Charter Sch. v. Dep't of Educ.*, 244 A.3d 885, 889 (Pa. Cmwlth. 2020) (*en banc*) (emphasis added). I would

conclude that Respondents have not shown with certainty that the law will not permit recovery in this case. I believe Petitioners have pled sufficient facts to overcome Respondents' Preliminary Objections, except for their challenge to CeaseFire PA's standing.

While I recognize that *Ortiz* is binding precedent, it did not address the specific constitutional challenge asserted here. *Ortiz* was also decided in 1996. In the nearly three decades since that decision, gun violence in our Commonwealth has skyrocketed, increasing exponentially in the past few years alone. Allowing local municipalities to adopt more stringent regulations to protect their residents from gun violence is becoming an increasingly urgent matter. As Justice Russell Nigro convincingly stated in his Dissenting Opinion in *Ortiz*: "[W]henever the state legislature fails to enact a statute to address a continuing problem of major concern to the citizens of the Commonwealth, a municipality should be entitled to enact its own local ordinance in order to provide for the public safety, health and welfare of its citizens." 681 A.2d at 157 (Nigro, J., dissenting). I could not agree more.

Therefore, I would overrule each of Respondents' Preliminary Objections to the Petition for Review, except for the objection challenging CeaseFire PA's standing. For these reasons, I respectfully dissent from the Majority's Opinion.

_____
ELLEN CEISLER, Judge

Judge Wojcik joins in this Dissenting Opinion.